The ERIE STONE COMPANY, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

TOLEDO STONE & GLASS SAND COMPANY, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

Nos. 14402, 14403.

United States Court of Appeals
Sixth Circuit.

June 4, 1962.

Ross W. Shumaker, Toledo, Ohio (Carl V. Bruggeman, John J. Kendrick, Toledo, Ohio, on the brief; Shumaker, Loop & Kendrick, Toledo, Ohio, of counsel), for appellants.

Melva M. Graney, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Peter J. Donahue, Attys., Dept. of Justice, Washington, D. C., Russell E. Ake, U. S. Atty., Toledo, Ohio, on the brief), for appellee.

Before MILLER, Chief Judge, and McALLISTER and WEICK, Circuit Judges.

McALLISTER, Circuit Judge.

These consolidated cases, involving federal income and excess profits taxes, are concerned with depletion allowances and depend upon the meaning to be given certain kinds of sedimentary rock as set forth in the tax laws.

In these cases, the writer of this opinion is of the view that certain rock herein described as dolomite, or as dolomitic limestone of metallurgical and chemical grade, is entitled to a depletion allowance of 15% as "limestone of metallurgical and chemical grade," and that the so-called "No. 63 limestone" is entitled to a statutory depletion allowance of 10% as a calcium and magnesium carbonate.

Judge MILLER is of the opinion that the dolomitic limestone, or dolomite in this case, is entitled only to a 10% depletion allowance as "dolomite"; and that the "No. 63 limestone" is entitled to only a 5% depletion allowance as "stone."

Judge WEICK is of the view that the dolomitic limestone, or dolomite, is entitled to a depletion allowance of 10% as dolomite, and that the "No. 63 limestone" is entitled to a depletion allowance of 10% as "dolomite." Judge WEICK, therefore, agrees with Judge MILLER on the depletion allowance to be given the dolomitic limestone, or dolomite; but he agrees with the writer of this opinion that the "No. 63 limestone" is entitled to a depletion allowance of 10%, not as a calcium and magnesium carbonate, however, but as "dolomite."

The result of the majority views, as variously expressed in the three opinions, is to affirm the judgment of the district court in holding that the dolomitic limestone, or dolomite in this case, is entitled to a depletion allowance of 10% as a "dolomite"; but to reverse the judgment of the district court that the "No. 63 limestone" is entitled to a depletion allowance of 5% as "stone" rather than a depletion allowance of 10%.

The facts of the case are as follows: The taxpayers operated three stone quarries and processing plants. They claimed they were entitled to 15% statutory depletion allowance on the gross income from certain of their rock product on the ground that the product was limestone of metallurgical or chemical grade, and that a certain "No. 63 limestone" should receive a 10% depletion allowance as calcium carbonate or magnesium carbonate.

The government contends that, with the exception of the "No. 63 limestone," the taxpayers were entitled only to 10% depletion allowance, on the theory that their product was dolomite, but not metallurgical or chemical grade limestone. As to the "No. 63 limestone," the government claimed that taxpayers were entitled only to a 5% depletion allowance, as "stone."

The District Court concurred in the view of the government, and held that the "No. 63 limestone" was entitled to a 5% depletion allowance, as stone, and that the other rock product was dolomite, entitled to a 10% depletion allowance, and could not be considered as limestone of a metallurgical or chemical grade, entitled to a 15% depletion allowance.

The question is whether certain of taxpayers' products was properly classified as limestone of a metallurgical or chemical grade entitled to a 15% depletion allowance; and whether the balance of taxpayers' product, known as "No. 63 lime-

stone," was entitled to a 10% depletion allowance, as calcium carbonate or magnesium carbonate, rather than a 5% depletion allowance as "stone," within the intendment of the statute.

The statute in effect at the critical period [1] provided that the depletion allowance should be—

"(i) in the case of * * * stone * * * 5 per centum,

"(ii) in the case of * * * dolomite * * * 10 per centum,

"(iii) in the case of * * * metallurgical grade limestone, chemical grade limestone * * * 15 per centum, * * *."

Taxpayers submit that their deposits were "admittedly a very high-grade kind of limestone known as the rock dolomite, or dolomitic limestone," but they say that these deposits are not to be classified as dolomite under the above-quoted provision (ii) of the statute, because such a high-quality dolomitic limestone, having a high carbonate content and a very low percentage of impurities, is suitable for metallurgical or chemical purposes, and should be classified as metallurgical grade limestone and chemical grade limestone, under provision (iii) of the above-quoted statute. In other words, they submit that while their product is "dolomite," it is not limited to the 10% allowance, but is entitled to the 15% allowance because it is a dolomite or dolomitic limestone suitable for metallurgical and chemical purposes.

In its decision in this case, the trial court observed that Congress had revised the Act "so as to make it understandable, but that still leaves the problem up to the courts, where they have made three different classifications and used certain words and certain terms, and those words and those terms overlap, and they leave it up to the courts, then, to determine what they meant."

Much of the testimony in this case revolves about the question of what dolomite is. Pure mineral dolomite which contains no impurities would consist of 54.27% of calcium carbonate, and 45.73% of magnesium carbonate. Such pure mineral dolomite is not a commercial item, nor is it bought or sold in commerce. It is seldom found in nature, and, then, only in the form of crystals.

We have here for consideration rock dolomite. Of the taxpayers' rock dolomite, it consists, on the average, of 54.20% of calcium carbonate, 43.40% of magnesium carbonate—a total of 97.60% of carbonates—and 2.40% of impurities. Authorities differ greatly among themselves as to what constitutes rock dolomite; but all of them agree that magnesium carbonate must be present in substantial quantities extending, according to various opinions, in a range from 19% to 45%. Much of the conflict of opinion of witnesses is with respect as to how much magnesium carbonate must be present—together with calcium carbonate—to entitle the rock product to be termed dolomite. However, no controlling issue here arises as to whether taxpayers' product could be properly termed dolomite, for, as the trial court said, "there can be no question but that both parties agree that the product of these quarries was 'dolomite,' within the commonly accepted definition of 'dolomite'." The point wherein the government and the taxpayers differ is whether a dolomite of metallurgical and chemical grade comes within the classification of limestone of metallurgical and chemical grade, within the intendment of the statute.

It is my view that a fair reading of the evidence, as hereafter appears, discloses that "stone" is a general term, as used in subsection (i) of the above-mentioned statute, and includes "dolomite," and limestone. "Dolomite" is included in the term limestone; and limestone of a metallurgical and chemical grade includes dolomite of a metallurgical or chemical grade. In other words, this

---

4. Title 26 U.S.C.A. Section 23(m) and Section 114(b) (4), (A) (i) (ii) (iii),

Internal Revenue Code of 1939, as amended.

case is a striking instance where a statutory definition of one material overlaps and includes another material.

In support of the foregoing conclusions, I refer, first, to one of the controlling considerations in the case, the legislative history of the applicable provision of the statute, which discloses:

(a) That the Senate Finance Committee Report which added the statutory provisions here in question, made clear that the various materials named in the statute and the depletion rates should be given their customarily understood commercial meanings;[2] and

(b) That, in the Conference Report on the Statutory provision here in question, Congress recognized it had used overlapping terms to describe different materials, and laid down the rule that it was to be understood that "in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification."[3]

It is notable that the statute nowhere mentions limestone as such. The only reference therein is to limestone of a chemical or metallurgical grade. In other words, the statute is concerned, as far as limestone goes, only with a specific kind of limestone. The distinction of classifications in the statute, therefore, is not between dolomite and limestone, but between dolomite, and limestone of a specific kind—that which is suitable for chemical or metallurgical use.

The government contends that dolomite is an entirely different kind of mineral rock than limestone; that, accordingly, dolomite and any kind of limestone are mutually exclusive rock products; that,

if a rock product is a dolomite, it cannot come under the classification of a limestone, or of a limestone suitable for metallurgical or chemical use; and that dolomite, of high or low grade, must be limited to a 10% depletion allowance, regardless of whether it is suitable for metallurgical or chemical use. Taxpayers emphasize that while dolomite may be a more specific term than limestone, nevertheless, limestone of a metallurgical or chemical grade is a more specific term than dolomite.

What we are concerned with in this case is what the commonly understood commercial meaning of dolomite is, for it is that particular meaning that here controls, in accordance with the rule set forth in the Report of the Senate Finance Committee, on the Amendment to the Act here under discussion.[4]

Taxpayers contend that one of the commonly understood commercial meanings of dolomite is a limestone, and that, although their product was dolomite, it was a high-grade dolomite, or dolomitic limestone, suitable for metallurgical or chemical use and, therefore, came within the statutory classification of limestone of a chemical or metallurgical grade.

In keeping with the rule outlined in the Senate Finance Committee Report, it is held that the courts are not concerned with classic definitions or recondite scientific theories concerning the term "dolomite," but only with the commonly understood commercial meaning of that term. Blue Ridge Stone Corporation v. United States, 170 F.Supp. 569, 572 (D.C.W.D. Va.).

What, then, can be said to be the commonly understood commercial meaning of "dolomite," and is dolomite commonly understood to be limestone?

---

2. Senate Report No. 781, 82nd Congress, 1st Session, page 38; 2 U.S.Code, Cong. and Adm'n Service, pp. 2006–2008, 2052–2053.

3. Conference Report No. 1213 of the House and Senate on the 1951 Amendment to the 1939 Code, 82nd Congress, 1st Session, p. 77, 2 U.S.Code, Cong. and Adm'n Service, pp. 2132–2133, 2158.

4. The Senate Finance Committee, which added the provisions here in question, stated in its Report: "The names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning." See Blue Ridge Stone Corporation v. United States, 170 F.Supp. 569, 572 (D.C.W.D. Va.).

The taxpayers' product in question is officially classified as limestone in official publications and rulings, including the following:

(1) The United States Department of Agriculture, in its official publication, "Liming Soils for Better Farming," Farmers' Bulletin No. 2032, defines "dolomite" as follows:

"Dolomite—Limestone containing magnesium carbonate in amount equivalent, or nearly so, to the calcium carbonate content of the stone. Limestone containing magnesium carbonate in lesser proportions is properly called magnesian limestone or dolomitic limestone."

(2) Dolomite, used for the production of lime, was treated by the Commissioner as chemical grade limestone, entitled to a 15% rate of depletion, in Revenue Ruling 56–582 (C.B. 1956–2, p. 981).

(3) Dolomite used for flux purposes in blast furnaces was considered and treated for depletion purposes by the Commissioner as metallurgical grade limestone, entitled to a 15% rate of depletion. Revenue Ruling 55–700 (C.B. 1955–2, p. 569).

The two foregoing Revenue Rulings were promulgated at a time when the Commissioner was committed to the end-use doctrine, which was abrogated by the decision of this court in United States v. Wagner Quarries Company, 260 F.2d 907. But the fact that the end-use theory was rejected by the courts does not alter the general nature of the effect of these admissions by the Commissioner that dolomite was considered as chemical and metallurgical limestone in the given instances inasmuch as the Commissioner apparently was willing to admit that dolomite is chemical grade or metallurgical grade limestone, when actually used for those purposes. This is strongly persuasive that one of the commonly understood commercial meanings of dolomite was that it was a limestone.

Moreover, since the partial abandonment by the Commissioner of the end-use test, Revenue Ruling 57–288 (C.B. 1957–1, p. 518) has been promulgated by the Commissioner, in which it is stated that any limestone rock which has a magnesium carbonate content of 35% or higher shall be designated as dolomite.

In addition, in a proposed regulation, after the end-use test was rejected by the courts, the Commissioner proposed a definition of dolomite as limestone containing a magnesium carbonate content of 35% or higher by weight.

What is "commonly understood commercial meaning"? Terms used in classification of subjects of taxation must be used in their known commercial sense, according to the general usage and known denominations of trade. See Notes on U.S.Reports, 9 Wheat. 260, 6 L.Ed. 260.

As said by Mr. Justice Story, speaking for the court in Two Hundred Chests of Tea, Smith, Claimant, 9 Wheat. 430, 438, 22 U.S. 430, 438, 6 L.Ed. 128, where classifications of tea were involved in a revenue act:

"If we were to advert to scientific classifications for our guide on the present occasion, it is most manifest, from the works cited at the bar, that bohea is a generic term, including under it all the black teas, and not merely a term indicating a specific kind. But it appears to us unnecessary to enter upon this inquiry, because, in our opinion, Congress must be understood to use the word in its known commercial sense. The object of the duty laws is to raise revenue, and for this purpose to class substances according to the general usage and known denominations of the trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists, or botanists. It applied its attention to the description of articles as they derived their appellations in our own markets, in our domestic as well as our foreign traffic. And it would

have been as dangerous as useless, to attempt any other classification than that derived from the actual business of human life. \* \* \* It is not meant to affirm that there is no such simple and distinct tea known as bohea. All that the evidence justifies us in saying is, that this is not the common bohea of commerce. \* \* \* In this apparent conflict of competence and credible witnesses, the only way of reconciling the testimony is to suppose that they do not speak *ad idem*; that the Boston witnesses speak to the specific nature of the particular teas in controversy, and the New York witnesses to their known commercial denomination in their actual state. In this way of considering the testimony, the conflict exhibits more a matter of apparent than real diversity of opinion. But if it be not thus reconcilable, it appears to us that the weight of the evidence is so strong that teas of this description have been long imported into our market as bohea, that no court of justice would feel itself authorized to inflict the forfeiture under the statute, under a presumed intentional violation of its provisions."

In United States v. Breed et al., 24 Fed.Cas. pp. 1222, 1223, Mr. Justice Story, sitting as Circuit Justice in the Circuit Court of the District of Massachusetts, stated:

"What, then, is meant by 'loaf-sugar,' in a commercial sense, by which I mean, not merely among merchants, but among buyers and sellers generally in the domestic trade? Has it any generally received, uniform meaning? If it has, then, that must be presumed to be the meaning adopted by the legislature \* \* \*. I agree to the law laid down in the case of Two Hundred Chests of Tea, 9 Wheat. [22 U.S.] 435. That case was as fully considered, and as deliberately weighed, as any which came before the court. It was there laid down, that, in construing revenue laws,

we were to consider the words, not as used in their scientific or technical sense, where things were classified according to their scientific characters and properties, but as used in their known and common commercial sense, in the foreign and domestic trade. Laws of this sort taxed things by their common and usual denominations among the people, and not according to their denominations among naturalists, or botanists, or men of science."

As bearing on the commonly understood commercial meaning of the term, "dolomite," cross-examination of the government's two expert witnesses disclosed the following definitions in the standard dictionaries, encyclopedias, scientific works, and government bulletins:

In Webster's New World Dictionary of the American Language, College Edition, 1953, dolomite is defined as:

"A rock mainly of magnesium carbonate and calcium carbonate; *a limestone* or marble with much magnesium carbonate in it." (Italics supplied.)

In Webster's New International Dictionary of the English Language (Second Edition, 1950) Unabridged, appears the following definition:

"dolomite, n. [After Deodate de Dolomieu, French geologist.] a Mineral. A calcium magnesium carbonate, of varying proportions. (Ca, Mg) $CO_3$, found in rhombohedral crystals, and in extensive beds as a compact limestone, often crystalline granular, either white or clouded, \* \* \* b Petrog. A limestone or marble rich in magnesium carbonate, —dolomitic adj."

In the Encyclopedia Britannica, 1956 Edition, dolomite is defined as follows:

"Dolomite—rock, also known as dolomitic or magnesian limestone, consists principally of the mineral dolomite, which is a carbonate of magnesium and calcium, but often contains a mixture of other sub-

stances such as calcite, quartz, carbonates and oxides of iron, argillaceous material and chert or chalcedony."

In the 1955 Book of Standards of the American Society for Testing Minerals, appear the following definitions:

"DOLOMITE.—A limestone containing in excess of 40 per cent of magnesium carbonate as the dolomite molecule.

"MAGNESIAN (DOLOMITIC) LIMESTONE—A limestone containing not less than 5 nor more than 40 per cent of magnesium carbonate."

In "A Glossary of the Mining and Mineral Industry" by Albert H. Fay, U. S. Department of the Interior, Bureau of Mines (1947) Bulletin 95, page 225, dolomite is defined as:

"1. A carbonate of calcium and magnesium. * * *

"2. A term applied to those rocks that approximate the mineral dolomite in composition. * * * Also called Magnesian limestone. * * "

In "A Handbook of Rocks," by James Furman Kemp, 1940, the following is stated:

"Limestones with 5–15 per cent MgO are called magnesian limestones, and those near 20 per cent, dolomite limestones."

In his "Guide to the Study of Rocks," by L. E. Spock (1953), it is stated:

"Dolomitic limestones are those in which the essential mineral is dolomite rather than calcite. Rocks of intermediate composition are called magnesian limestone."

In a "Dictionary of Geological Terms" (1945), dolomite is defined as follows:

"dolomite. 1. A carbonate of calcium and magnesium, $(CaMg) CO_3$. 2. A term applied to those rocks that approximate the mineral dolomite in composition. * * * Also called magnesian limestone."

In "The Stone Industries" by Oliver Bowles (1939), it is stated that "the general term 'limestone,' *as used in stone industry,* includes both pure and impure limestone, high-calcium limestone, magnesian limestone, dolomite, and crystalline forms that usually are classed as marbles." (Italics supplied.)

In Information Bulletin 7738, Bureau of Mines, U. S. Department of the Interior, March 1956—Limestone and Dolomite by Oliver Bowles, it is stated:

"The essential constituent of limestone is calcium carbonate ($CaCO_3$). If the magnesium carbonate content is small the rock is known as 'high-calcium' limestone. If 10 percent or more of magnesium carbonate is present, it is called 'magnesian' or 'dolomitic' limestone. When the content of magnesium carbonate approaches 45 percent, it is known as dolomite, which is the double carbonate of calcium and magnesium ($CaCO_3$. $MgCO_3$). The term 'limestone' in its broader sense includes dolomite."

The above definitions and statements of the authorities, to the effect that dolomite is a limestone, as defined in government bulletins and, also, heretofore, in various rulings by the Commissioner of Internal Revenue, as well as in dictionaries, encyclopedias, and standard works on the subject, are of considerable weight in the resolution of the two questions which are here controlling:

(a) Did Congress intend that limestone, *in its commonly understood commercial meaning,* should include dolomite?

(b) Did Congress intend that limestone of a chemical or metallurgical grade, *in its commonly understood commercial meaning,* should include dolomite of a chemical or metallurgical grade?

In its brief on appeal in this court, in United States v. Wagner Quarries Company, supra, the government recognized that dolomite was to be treated as a kind of limestone, and gave two examples of its use, as follows:

"dolomite is a distinct type of limestone containing a relatively high percentage of magnesium carbonate.

"Professor Landes also set up requirements for dolomite, a limestone consisting of a large percentage of magnesium carbonate."

The intent of Congress is often to be found in the legislative history of a provision of a statute under consideration by the courts. While, in the controversy before us, the terms overlap and are not defined in the statute or legislative history, the Committee Reports of the House and Senate reflect light upon the subject and contain the testimony and written reports of Dr. Kenneth K. Landes, formerly head of the Department of Geology of the University of Michigan, who appeared before the Committees of the Congress, while the Amendment here involved was under consideration, and advised Congress concerning the importance, scarcity, and nature of the metallurgical and chemical grade limestone, and the part they play in our economy and national security; and Dr. Landes' testimony and reports are of transcendent importance in this case.

It appears that Dr. Landes was a witness in a prior case, Wagner Quarries Company v. United States, 154 F.Supp. 655 (D.C.Ohio); and on appeal of that case to this court, the government in its brief, recognized the influence of Dr. Landes' report and testimony on Congress in the enactment of the provision of the statute here in question, in these words:

"In view of his extensive academic and commercial experience, and the role he played before Congress at the time the statutory provision in question was enacted, we cannot imagine a person more qualified than Professor Landes to testify with respect to the commonly understood commercial meaning of the terms 'chemical grade limestone' and 'metallurgical grade limestone,' as used in Section 114(b) (4) (A) (iii) of the 1939 Code."

Having in mind the government's contention in the Wagner Quarries case that no one was more qualified than Dr. Landes to testify with respect to the commonly understood commercial meaning of the terms, "chemical grade limestone" and "metallurgical grade limestone" as used in the statutory provision here in question, and of the role he played before Congress at the time it was enacted, we come to the consideration of his report and his testimony before the Congressional committees.

It appears, in this connection, that Dr. Landes testified before the House Ways and Means Committee that high quality-metallurgical grade limestone is just as essential to the making of steel as is iron ore, and is also necessary for the making of many chemicals; that limestone is common and abundant in the United States, but that metallurgical stone constitutes only a very small part of the total of limestone rock; that it is a valuable, essential, and an exhaustible mineral resource; and that the conclusion is inescapable that metallurgical limestone is a natural resource occurring in deposits, definitely limited as to recoverable volume, and that withdrawals from a deposit of metallurgical grade limestone exhaust the value of the property. Dr. Landes also testified before the Ways and Means Committee that the largest deposits of metallurgical and chemical grade limestone in Ohio consisted of dolomite located in the north central part of the State, southeast of Toledo. In the course of his testimony, Dr. Landes submitted a paper, entitled "Metallurgical Limestone Reserves in the United States," which was made a part of the records of the Committee. In his report, which was duly considered by the Committee, Dr. Landes stated: *In this report 'limestone' will be used as in industry for both limestone and dolomite except where the latter is specifically mentioned.*" (Italics supplied.) He further, in his report, set up four grades of limestone suitable for metallurgical and chemical purposes, two of which describe limestone of a high calcium carbonate variety, and the other two, limestone of the high magnesian kind, sometimes referred to as dolomite. He also showed by a table in his report that dolomitic lime-

stone, or dolomite, was useful for metallurgical purposes as a flux in a blast furnace, and for chemical purposes in making lime and other chemical products. The limestone known as dolomitic limestone was also shown to be useful for refractory purposes in furnace linings.

In the light of Dr. Landes' report and testimony before the various Congressional committees having for consideration the proposed statutory provisions in question; in view of the government's recognition that no person was more qualified than Dr. Landes to testify with respect to the commonly understood commercial meaning of chemical grade limestone and metallurgical grade limestone, as used in the statute; and in consideration of the fact that no other authority appeared before the Congressional committees to question, contradict, or qualify the views expressed by Dr. Landes,—in my opinion, it follows that Congress, in enacting the statutory provision in question, was guided by, and followed Dr. Landes' views as contained in his testimony and report, and intended that limestone should be considered to include dolomite, *"as in industry,"*—which is equivalent to the "customarily understood commercial meanings" of those terms; and that metallurgical or chemical grade limestone should be considered to include dolomite, capable of metallurgical or chemical use.

From the foregoing, I conclude, in this case, that the term, limestone, includes dolomite; and that limestone of metallurgical and chemical grade includes dolomite of a metallurgical and chemical grade.

The remaining question is, assuming from the foregoing conclusions that "limestone" includes "dolomite" in the customarily understood commercial meaning of the terms, and that metallurgical and chemical grade limestone includes dolomite capable of metallurgical or chemical use—Was taxpayers' dolomite capable of metallurgical or chemical use?

In its opening statement on the trial of the instant case, the government agreed that the proper definition of chemical and metallurgical grade limestone was "a limestone high in total carbonates, very low in impurities, and suitable for chemical and metallurgical purposes," as set forth in a statement by this court in United States v. Wagner Quarries Company, supra. There is no question that taxpayers' product was high in total carbonates and very low in impurities. The government at no time contended that taxpayers' product (whether called chemical or metallurgical grade limestone or dolomite) was not suitable for metallurgical and chemical use. The government clearly submitted the case solely on the question whether a dolomite capable of metallurgical or chemical use could come within the statutory classification of a limestone capable of metallurgical or chemical use. As government counsel said in their opening statement:

"Now, I assume that Mr. Shumaker will bring in evidence to show that this stone could be used as flux stone for metallurgical purposes. We say that doesn't make any difference what it could be used for. * * Consequently, it is the government's position in this case * * * [that] the plaintiffs' stone is dolomite and therefore it is entitled to a 10% depletion allowance, completely regardless of what it may be suitable for. * * *"

Accordingly, no evidence was introduced by the government as to whether or not taxpayers' product was capable of metallurgical or chemical use. The only evidence on this question was that introduced on behalf of the taxpayers.

Dr. Herbert F. Kriege, taxpayers' expert witness, is a man of outstanding qualifications, based not only upon academic learning, but also actual experience in the limestone industry. He holds a Bachelor's and Master's degree from Ohio State University, and a Ph.D. from the same university, majoring in soils, ceramics, and mineralogy. He also has a large practical experience, having been the director, for more than thirty years, of the laboratories of The France Stone

Company, one of the greatest limestone producers in northwestern Ohio. He testified that he had an intimate acquaintance with the quality of the limestone produced from the three quarries here involved, during a period of more than thirty years, and that he made chemical and physical tests from each of the quarries on many occasions. He described the product and the numerous chemical tests which he made, and told of the uses, capabilities and suitability of the rock for different purposes.

Dr. Kriege testified, without contradiction, that taxpayers' product was capable of use as a flux in blast furnaces in the process of making steel, in the production of lime, in paper making, glass manufacture, in refractories, and in soil neutralization, and that, because of its high total neutralizing power, it was especially suitable for use in correcting soil acidity. To sum up, Dr. Kriege testified that taxpayers' product was suitable for metallurgical and chemical purposes, and also was limestone of metallurgical or chemical grade. Witnesses for the government were not even asked to testify concerning the chemical quality of taxpayers product, or its suitability for metallurgical or chemical purposes. Therefore, the only evidence in the record on the subject of the chemical quality, and the suitability of the product for metallurgical or chemical purposes is the undisputed evidence of the chemical tests above mentioned and the undisputed testimony of Dr. Kriege, who was qualified and unimpeached, and whose testimony, accordingly should have been accepted as proof of these facts by the court. Wright-Bernet, Inc. v. Commissioner of Internal Revenue, 172 F.2d 343 (C.A.6). Unimpeached, uncontradicted testimony from a well-qualified, impartial witness cannot be disregarded by the court. Such testimony should be accepted by the fact finder in a matter in which the fact finder has no knowledge or experience upon which he could exercise an independent judgment. The District Court, in its opinion, stated that it was "not here convinced that the product of Taxpayers'

quarries is capable of use for metallurgical or chemical purposes." The court further went on to say: "Counsel for Taxpayers rely * * * upon the testimony of Dr. Herbert F. Kriege, a capable and experienced chemist, who was of the opinion that the taxpayers' product was suitable for metallurgical or chemical purposes. * * * This was the opinion of the witness unbuttressed by actualities that assisted us in the Wagner case. In the Wagner case, we concluded from the evidence that approximately 40% of the stone mined and marketed *was sold* for metallurgical and chemical uses. *In other words, the product was so inviting as to induce the metallurgical and chemical industry to purchase it for their uses.* In the cases before us, there is no evidence that the product of the Taxpayers' quarries was inviting to the metallurgical and chemical industries. We conclude, therefore, that the product might possibly be usable for certain metallurgical or chemical purposes where economic factors may, in the opinion of the user, justify its use, but we cannot conclude that it is suitable for these purposes within the terms of the definition laid down by the Court of Appeals." The definition mentioned in the foregoing appears in United States v. Wagner Quarries Company, 260 F.2d 907, 908, where this court said: "The test is not what various purposes the limestone might be used for,—this is conceded, but rather whether it can be found to qualify for chemical or metallurgical purposes." In its brief in the instant case, the government says: "It should also be noted that the parties agree that the proper classification of the taxpayers' deposits does not depend upon the actual use to which the deposits were put." The fact that taxpayers did not show sales for metallurgical or chemical purposes, and did not prove that the product was so inviting as to induce the metallurgical and chemical industry to purchase it for their uses does not derogate from the force of taxpayers' evidence, as shown by the persuasive and undisputed testimony of Dr. Kriege that the product was suit-

able, and could qualify for metallurgical and chemical purposes.

It is my opinion that since the uncontradicted, unimpeached testimony of Dr. Kriege, a well-qualified and impartial witness, was that taxpayers' product was capable of metallurgical and chemical use—as a flux in blast furnaces in the process of making steel, in the production of lime, in paper making, glass manufacture, in refractories, and in soil neutralization because of its high total neutralizing power, in correcting soil acidity—such testimony should have been accepted by the court in a matter in which, as the authorities express it, it had no knowledge or experience upon which it could exercise an independent judgment.

With regard to the "No. 63 limestone," Dr. Kriege testified that since it was composed of 32.20% of calcium carbonate, 26.30% of magnesium carbonate, and 36.42% of silicon dioxide, such limestone would be both a calcium carbonate and a magnesium carbonate. This testimony was uncontradicted. Under the same provision of the statute which includes the depletion allowance for dolomite, namely, subsection (ii),[5] are included calcium carbonates and magnesium carbonates entitled to a 10% depletion allowance. The District Court, in its opinion, found that the testimony in the case "was not very enlightening, but that, from the record, this product may properly be classified as 'stone' in accordance with what we believe to be the intent of Congress, for its potential use seems to be limited to that of ballast." We are of the view that the uncontradicted, impartial testimony of Dr. Kriege should have been accepted by the court, and that the "No. 63 limestone" should have been held to be a calcium carbonate and a magnesium carbonate, entitled to a 10% depletion allowance under subsection (ii) of the statutory provision here involved.

In this controversy, which is the first of a number of cases filed, embodying questions of such considerable importance to the taxpayers and to the government, we consider it proper to review, in some detail, the testimony of appellant government's expert witnesses, as it bears upon the largely factual issues before us; and we feel the special obligation so to review such testimony because of our inability to accept the government's contentions.

Of the two expert witnesses for the government, one was Joseph Berman, an able and experienced geologist, employed by the Natural Resources Section of the Internal Revenue Service. The other government expert witness was Dr. Edward H. Watson, Chairman of the Department of Geology of Bryn Mawr College, and, admittedly, a distinguished scholar and expert in his field.

Mr. Berman was exacting in the way in which he described and defined different rock minerals, and referred to the "loose" way in which others described and defined them. He defined dolomite as "a rock that primarily is composed of the mineral dolomite. Now, that is the *technical* terminology for dolomite." He defined limestone as a rock primarily composed of calcite. When asked on direct examination if dolomite and limestone were mutually exclusive terms, he answered:

"Well, they are mutually exclusive in this way: If somebody says a dolomite, nobody considers it a limestone; as far as I know, nobody working in the field, because when you say 'dolomite' you specifically identify it as containing magnesium carbonate, containing a magnesium carbonate molecule *in appreciable amounts.*

"When the term limestone is used in the commercial and technical sense, there is no question of what it is. *There are occasions when people will use the term very broadly, including all the carbonates, such as siderite and magnesite, and maybe*

5. Title 26 U.S.C.A. § 23(m) and Section 114(b) (4) (A) (i) (ii) (iii) Internal Revenue Code of 1939, as amended.

*even dolomite, when they don't care what the composition of the material is."*

On cross-examination, Mr. Berman stated, in answer to a question, that dolomite is not limestone. When asked if it were not quite common to define the term dolomite rock as a limestone, he replied:

"I have seen in print such statements, but almost uniformly where they do that, they immediately explain what they mean, that one is a dolomite, one is a limestone; *but there are occasions when they will lump them together when they have no purpose in separating them,* like stone, say."

He further stated that it was his position—as an expert—that dolomite, the rock, is not a limestone. He testified that it was probably true that he knew more about the general subject of dolomite and limestone than anyone else in Washington in the Internal Revenue Service, and that although the subject matter was peculiarly within his knowledge, the Commissioner of Internal Revenue, who had recently proposed new definitions as to limestone and dolomite, had never consulted him. He declined to say that the Commissioner of Internal Revenue was proposing to define dolomite as a limestone, although such was the fact. On this subject he testified: "I do not know what the Commissioner of Internal Revenue was trying to do." He said he had not read up on that feature before coming to Toledo to testify as an expert. "I was told that the regulations had not been formalized and approved *and*

*there has been a great deal of argument in that respect,* and I only came here as a geologist and mineralogist, not as a representative of the Internal Revenue, as such."

Mr. Berman testified that many dolomites are marbles. It is to be noted that under the statutory provisions, marble is entitled to a depletion allowance of only 5%, whereas dolomite is entitled to 10%. He further stated that he had testified in Blue Ridge Stone Corporation v. United States, 170 F.Supp. 569 (D.C. Va.), in which the court had decided adversely to his views, that, at least *90%* of the mineral dolomite should be present in rock before it could be rock dolomite. He was then asked whether Dr. Byron N. Cooper, head of the Geology Department at Virginia Polytechnic Institute, had also been a witness in the same case and had disagreed with him, testifying that a rock composed of more than *50%* of mineral dolomite is commonly known in the trade as dolomite. This was 40% less mineral dolomite than Mr. Berman had stated was necessary to constitute rock dolomite. Mr. Berman first stated that Dr. Cooper had not disagreed with him, but that he had rather qualified his statement. When the District Court's opinion in that case was quoted to him, in which it was stated that Dr. Cooper had so testified, Mr. Berman at first disputed it, but afterward admitted he may have forgotten and that Dr. Cooper may have so testified, and had actually disagreed with him. Much of the value of Mr. Berman's testimony suffers from inconsistencies,[6] refusals to give plain

6. Mr. Berman testified on cross-examination as follows:

"Q. Will you answer my question as to whether the experts on this subject differ very greatly among themselves as to the percentage of magnesium carbonate that must be present before you can call a rock a dolomite?

"A. It depends on what,—

"Q. (Interposing) Answer my question as to whether the experts and authorities differ, please.

"A. I don't know what you mean by dolomite. You want to know what my definition of,—

"Q. (Interposing) You have already told us that.

"A. Well, you tell me what you mean, what you say a dolomite is and I'll tell you whether the experts agree.

"Q. Then you don't care to answer my question, do you?

"A. Well, I can't answer it because you haven't told me what you mean by dolomite or what you are implying.

*        *        *        *        *

"Q. I refer you to the United States Department of the Interior Bureau of Mines Bulletin 95, A Glossary of the Mining and Mineral Industry by Albert

answers to simple questions, by his insistence that the definitions he himself uses for dolomite and limestone are the only right ones, regardless of the many definitions of other experts, as well as those found in numerous standard works, which are contrary to his—and his refusal to admit that any other experts differ from him, when that fact is obvious.

In any event, from the foregoing, Mr. Berman, himself an expert witness, declared, when confronted by the adverse views of other experts, that no experts are trustworthy; that, however, sometimes people use the term limestone very broadly as including dolomite; that there are occasions when dolomite and limestone are lumped together under the term limestone; and he finally disclosed his own rule of definition when he stated that, as far as regards other "quite authoritative people," who call dolomite a limestone of a specific type, "I am more definite about it than most people, who work with the field."

Dr. Edward H. Watson, the other expert witness for the government, testified that he preferred to divide the carbonate rocks into limestone, which includes those rocks predominantly made up of calcite, and the dolomites, predominantly made up of the mineral dolomite. He declared, however: "I am thoroughly conscious of the fact *that many people include dolomites in the limestones.* In fact, I feel very poorly towards some geologists because of their sloppy definitions of the terms, but many people do that. * * * I am aware of the definitions in Webster's and how that was done by Albert Johanssen, way back and that was not modified. There are many scientific terms and aspects there that are rather poor and out of date, and there is a general tendency, I would feel, for the older works to include dolomite in the general classification of limestones; whereas more recently I feel that more modern textbooks and people in general have tried to make a distinction and to limit the term limestone to the rocks necessary in calcite and leave dolomite by itself, in a sense, as a somewhat equivalent term. * * * But I am very conscious of the usage."

When asked by government counsel to state the meaning of "dolomite," Dr. Watson replied: "Well, there again there is confusion. In *my* commercial work, I would prefer—*and I say I would prefer,* because there are many different defini-

H. Fay. It was printed by the United States Government Printing Office, and I call your attention to the definition of dolomite contained in that document.

"You would consider that rather authoritative, wouldn't you?

"A. No. I wouldn't consider it authoritative. It is printed by the United States Government, but it is printed by an individual expert, or authored by an individual expert the same as any other expert, and as you know with these government publications there isn't,—

"Q. (Interposing) They are not trustworthy, are they?

"A. No; they are not trustworthy, like all experts.

* * * * *

"Q. Are you familiar with the exhibit that has been introduced here and put out by the Department of Agriculture, Farmers' Bulletin No. 2032?

"A. I don't remember. Do you mean the United States Department of Agriculture?

"Q. Yes.

"A. I am not familiar with that, no.

"Q. Well, assuming that it contains this definition of dolomite, 'Dolomite: Limestone containing magnesium carbonate in amount equivalent or nearly so to the calcium carbonate content of the stone. Limestone containing magnesium carbonate in lesser proportions may be properly called magnesian limestone or dolomitic limestone.'

"Do you agree with that?

"A. No, I wouldn't agree with it. *This is my personal definition. I,—*

"Q. (Interposing) Well, are you willing to admit now that there are many rather authoritative people who disagree with you when you say that dolomite, the rock, is not limestone?

"A. No, *they don't disagree with me,* but they qualify it by saying it is a specific type, and as such they give it a broad brush and call it limestone and include a lot of things in it; as I said, stone. *I am more definite about it than most people are who work with the field.*"

tions that have been brought into evidence here, but I would prefer to limit the term dolomite to a natural rock containing more than 90% of the CaMgCO₃ twice composition, and that means the mineral dolomite. In other words, the term dolomite just refers to the mineral dolomite which has the composition of calcium carbonate and magnesium carbonate." Later, on cross-examination, he was asked whether he did not find some confusion in connection with terms like magnesium carbonate and calcium carbonate, and he replied: "Well, those terms, I don't know what they mean, sir."

Whatever the reason for the answer of the witness on these technical matters, the fact that, on direct examination, he used the term calcium carbonate and magnesium carbonate in explaining the composition of dolomite and, then, on cross-examining he said that he did not know what the terms calcium carbonate and magnesium carbonate mean, leaves his testimony on an important aspect of the case in confusion.

Dr. Watson testified that in the industry with which he was familiar, limestone was not included in dolomite. Nevertheless, he said that he was perfectly willing to state that, in other industries, as Dr. Kriege, the chief expert witness of taxpayers had testified, limestone did include dolomite. Asked specifically whether in the definitions, as he had stated them, chemical and metallurgical trade limestone would include the term dolomite, Dr. Watson said: "I would not think so. I realize that you can say because some people do say that dolomites are a member of the limestone group in general and that metallurgical and chemical users use both of these materials, that therefore you could argue a good dolomite is a chemical grade limestone, but to me it distorts the meaning."

Dr. Watson admitted that there was a wide diversity of opinion among responsible authorities as to the amount of magnesium carbonate that must be present in a dolomite rock, before it could be called dolomite; that Dr. Byron N. Cooper, head of the Department of Geology of Virginia Polytechnic Institute, who was considered one of the responsible authorities by Dr. Watson, differed with him on this crucial aspect of the instant case; that while some authorities would call dolomite, limestone or dolomitic limestone, Dr. Watson disapproved of such terminology because he thought "it is sloppy and the cause of a lot of our trouble * * * and that is just the point;" but that he agreed that responsible authorities defined dolomite, the rock, as a limestone. When he was informed that the Commissioner of Internal Revenue had, within the year before the trial, defined or attempted to define dolomite in terms of limestone, and had fixed the percentage of magnesium carbonate at 35, Dr. Watson declared: "I think it is deplorable, and I don't see that he has any authority to do so. You can't legislate or pronounce upon things."

Finally, on cross-examination, Dr. Watson was asked, and replied:

"Q. Doctor Watson, aside from your personal opinion how can you say, recognizing that respectable authority will say that a dolomite rock is a rock containing 22½ percent magnesium carbonate, and it runs all the way up to the ideal or perfect dolomite of 45–46 percent; how can you say it is a precise, definite concept under those conditions?

"A. Well, I don't like that definition you just gave. I think that is a poor idea and the cause of all our trouble here.

"Q. Well, you are critical of a lot of other authorities, aren't you, doctor?

"A. Yes, sir, oh, very critical. I try to teach my students not to believe what they read in print all the time.

"Q. Where are they going to learn, listening to what their professors tell them?

"A. No, sir, by thinking for themselves, I hope."

With regard to Dr. Landes, whose testimony and report were before Congress

at the time of the enactment of the critical provisions of the statute, and concerning whom, the government in the Wagner Quarries Co. case, supra, stated that it could not imagine any person more qualified to testify with respect to the commonly understood commercial meaning of the terms, chemical and metallurgical grade limestone as used in the statute, Dr. Watson took an entirely different view from the government's prior stand. He testified that Dr. Landes was one of his friends; that he had occasion to examine the document of which Dr. Landes was the author, entitled "Miscellaneous Limestone Reserves in the United States," which was used before the Congressional committees when this legislation was being formulated; that Dr. Landes, in that comprehensive study, included the dolomites and dolomitic limestone under the general heading of "Limestone;" that he had heard of these deposits in Ohio of dolomite, or limestone of the dolomitic nature, which were well known in geology; but that he entirely disagreed with Dr. Landes in calling them the biggest reserve of limestone in that state; that Dr. Landes called the dolomite, limestone, and that he, Dr. Watson, would not agree that such dolomite was limestone. Dr. Watson was then informed that before Congress had enacted the legislation here in question and the provisions of the statute containing the various terms and classifications, the Congressmen had read the paper of Dr. Landes and had questioned him at length. To this statement, Dr. Watson replied: "I can't see how Dr. Landes, whom I know, would have been responsible for those terms—I don't see how he could be responsible for them because they really don't make very much sense."

To sum up generally, then, the testimony of the government's expert witnesses, it appears that they concede that other authorities use the term, dolomite, as meaning limestone, although, in their opinion, such use of the term is sloppy, inaccurate, without exact meaning, and doesn't make much sense; that, in their opinion, dolomite means a specific sub-stance, different from limestone; and that they disagree with the testimony and statements of Dr. Landes before the Congressional committees, in which he termed dolomite a limestone, and testified that the largest deposits of limestone, in Ohio, available for metallurgical and chemical use, consisted of certain deposits of dolomite.

We should consider, then, the admonition contained in the legislative history of the statute involved, in which the Conference Report of the House and Senate directed that "in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification."

Which are the more specific terms, dolomite, or limestone of a metallurgical or chemical grade?

Dolomite, standing alone, may be a "high grade dolomite," a term used by the District Court in its opinion,—or a "low grade dolomite." If it is a high grade dolomite, it could be used as a fluxstone in a blast furnace in the manufacture of steel; if a low grade dolomite, it could not be used for such a purpose. Some dolomites can be used for chemical purposes; others cannot be. Moreover, dolomites are classified as: (1) argillaceous (clay) dolomite; (2) siliceous (silica) dolomite; (3) arenaceous (sandy) dolomite; and (4) cherty dolomite. Dolomites are often called magnesian limestones or dolomitic limestones, dependent upon the magnesian carbonate content. Many dolomites are marbles, and are entitled to only a 5% depletion allowance, although a dolomite which is not a marble, is entitled to a 10% depletion allowance, according to the statute. This is an instance where marble is a more specific term than dolomite—although it is a dolomite—and because it is a more specific classification, the lower percentage allowance governs in that particular classification.

There are many different scientific opinions on how much magnesium carbonate must be present before a sub-

stance can be termed a dolomite. As an instance, one authority considers that if there is 50% of mineral dolomite present, which will amount to 22½% of magnesium carbonate, the substance is dolomite. Another authority holds that at least 90% of mineral dolomite must be present before the substance can be considered dolomite.

In its brief on appeal in United States v. Wagner Quarries Company, supra, the government said:

"Actually, there is an overlap in the statute. As both Dr. Kriege and Dr. Bowles testified, the word 'stone' is broader than 'calcium carbonate' which, in turn, is broader than 'chemical grade limestone' or 'metallurgical grade limestone.' Furthermore, the expert testimony is in agreement that 'chemical grade limestone' and 'metallurgical grade limestone' connote a specific type or quality of limestone; and the District Court held that the terms or descriptions of specific mineral deposits and, as used in the statute, denote a definite type and quality of mineral, more specific than the terms 'stone' and 'calcium carbonates' also used in the statute."

It will be noted that the government's stand, in the Wagner case, was that the terms, chemical grade limestone and metallurgical grade limestone were more specific than the term, calcium carbonates. In passing, it may be remarked that calcium carbonates were included in the same statutory classification as dolomite for a depletion allowance of 10%, instead of the allowance of 15% for chemical and metallurgical grade limestone.

In United States v. W. R. Bonsal Company, 279 F.2d 465 (C.A.4), it was held that while the terms sand and "quarzite" are not mutually exclusive terms, "quartzite" as used in the statute, is a more specific term that "sand," which is also used in the statute. The court said that it was not intended that a mineral fall within a general classification, when a more specific application applied. The court held:

"When Congress was called upon to classify products of mines and quarries for depletion purposes, it relegated the meaner ones to the lower rates. Obviously, however, the intention was to allow the higher rates to materials which were rare or qualitatively adaptable to higher uses. * * * It seems plain that Congress did not intend a general term such as 'gravel,' which when applied to a rocky substance is descriptive only of the size of the fragments into which it is broken, to govern rather than a more specific classification according to the nature and quality of material. * * * As we have indicated, however, Congress realized a given material might fall within more than one classification, intending the more specific to govern. We think quartzite is more specific as a classification than the general terms which suggest no more than the size of the fragments into which the material is broken."

I am of the view that, in conformity with the foregoing, in the instant case, taxpayers' product was not only "stone" within the first category of the statute, and "dolomite" within the second classification, but it was also "metallurgical or chemical grade limestone" within the third bracket of the statute, which was qualitatively adaptable to higher uses and, hence, entitled to the depletion allowance at the rate of 15%.

Moreover, it is to be emphasized that while none of the government witnesses testified on the subject of whether dolomite was a more specific term than metallurgical and chemical grade limestone, Dr. Kriege was uncontradicted in his testimony that, *as used in trade and commerce, chemical and metallurgical grade limestone was a more definite and specific term than dolomite.* It therefore appears that, while the term dolomite appears from the evidence to be more specific than limestone, still the term dolomite, standing alone, is a word of

many meanings, and is less specific than *dolomite of a chemical or metallurgical grade, or than limestone of a chemical or metallurgical grade.*

Since, under the rule of construction of the statute to be followed in accordance with a direction of the House and Senate Conference Report heretofore mentioned, where a mineral is specifically provided for at a stated rate of percentage allowance, the specific provision will govern over the allowance provided for a more general classification, dolomite of a chemical and metallurgical grade, being equivalent to limestones of a chemical and metallurgical grade, is a more specific term than dolomite and hence would be entitled to the depletion allowance of 15% instead of the depletion allowance of 10% for dolomite.

Finally, it is to be said that, in expounding a statute, courts are not to be guided by a single sentence or part of a sentence, but must look to the provisions of the whole law, and to its object and policy. The object and purpose of amendatory provisions of the statute of 1951, here in question, were to extend the depletion allowance to metallurgical and chemical grade limestone. Mineral depletion for tax purposes is based on the belief that its allowance encourages extensive exploration and increasing discoveries of additional minerals to the benefit of the economy and strength of the nation. Courts are not concerned with the validity of the theory or with the statutory policy. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581. Allowance for depletion has been a controversial subject for years, and officials of the executive branch have sought from time to time, with conspicuous lack of success, to persuade the Congress to eliminate some of its alleged over-generous features. But that is not the concern of the courts, whose plain duty is to apply the allowance as Congress meant it. Dragon Cement Company v. United States, 244 F.2d 513 (C.A.1).

As Dr. Landes pointed out in his statement before the Congressional committees, metallurgical stone constitutes only a very small part of limestone rock in the nation, and it is a valuable, essential, and exhaustible mineral resource. He went on to say: "Every metallurgical limestone quarry or mine today is working a deposit which has definite boundaries, whether physical or economic, or both, beyond which exploration cannot go. Many of these deposits will reach these boundaries within the next ten years. * * * Of course, new deposits will be discovered in the future as in the past, but their discovery is becoming increasingly difficult and expensive. For example, one steel company has spent $100,000 during the last three years in the search for new deposits, and it is still forced to buy over half of the needed fluxstone from other producers. The conclusion is inescapable that metallurgical limestone is a valuable, natural resource, occurring in deposits limited as to recoverable volume. Each year's withdrawal from a deposit of metallurgical grade limestone exhausts the value of the property." Before the committees, Dr. Landes testified that the leading metallurgical stone producing states are Michigan, Pennsylvania, and Ohio, and that the biggest limestone deposits available for metallurgical or chemical use in Ohio consisted of the dolomite found in North Central Ohio.

Dr. Watson, the government witness, also recognized, whether they were called limestone or dolomite, that among the "very top deposits" in the United States for metallurgical purposes, one of the greatest reserves was the dolomite in Ohio, which was "pretty high grade dolomite" and that limestone or dolomite or dolomitic limestone were very useful in connection with the production of steel. In keeping with the pronouncement of the Supreme Court in United States v. Cannelton Sewer Pipe Co., supra, the depletion for metallurgical and chemical grade stone, whether called limestone or dolomite, must have been based on the belief of Congress that its allowance would encourage exploration and increasing discoveries of additional metallurgi-

cal and chemical grade stone, which is so essential to the making of steel and other products, and to the benefit of the economy and strength of the nation. Certainly, it requires no discussion to demonstrate that steel itself is of transcendent importance to the security and, even, survival of our nation in these crucial times, and that, as Dr. Landes, in his statement before the Congressional committees, said, metallurgical grade limestone is just as essential to the making of steel as is iron ore.

It appears, then, that one of the principal purposes of Congress in enacting this legislation, was to extend percentage depletion allowances to additional minerals, including metallurgical and chemical grade limestone, as an incentive for the opening up of new deposits and for the energetic development of existing properties. It would seem unreasonable to hold that Congress intended to discriminate between different metallurgical and chemical grade stone and to allow 15% depletion for metallurgical and chemical grade limestone, but only 10% depletion for metallurgical and chemical grade dolomite, in view of the fact that the expert, Dr. Landes, upon whom Congress relied in the formulation of the statutory provisions according to the statement of the government in the Wagner Quarries case supra, informed Congress that, *in industry,* limestone was used as a term for both limestone and dolomite.

It is the opinion of the writer, in view of the legislative history of the statutory provisions, the objectives of the legislation, the testimony of the witnesses, and the great weight of the authorities on the technical subject in question, that Congress, in formulating the various definitions and classifications of stone entitled to different depletion allowances, was guided by the expert advice and testimony of Dr. Landes, as contended by the government in the Wagner Quarries case, especially since no evidence or testimony contradictory to that of Dr. Landes appears to have been at any time presented to or considered by Congress; that, consequently, Congress intended that in the

statute, the term limestone should include dolomite, and that limestone of a metallurgical or chemical grade should be considered equivalent to dolomite of a metallurgical and chemical grade, a conclusion furthermore supported by the definitions of dolomite contained in the many standard works of reference, including the most generally recognized and accepted encyclopedias and dictionaries, as well as numerous other authorities on the subject.

Moreover, it is obvious from the record and the undisputed testimony that the term "dolomite," standing alone, is less specific than the term, "metallurgical and chemical grade limestone," and in accordance with the direction of the Conference Report above referred to, the specific provision of percentage allowance for metallurgical and chemical grade limestone prevails over the more general classification and allowance for dolomite. In addition, the uncontradicted, impartial and unquestioned testimony of Dr. Kriege, the taxpayers' expert witness, that "No. 63 limestone" was a calcium carbonate and a magnesium carbonate, which, by the statute is entitled to a depletion allowance of 10%, instead of a depletion allowance of only 5%, should have been accepted as proof of the fact in accordance with the authorities heretofore cited. Rookwood Pottery Co. v. Commissioner of Internal Revenue, 45 F.2d 43 (C.C.A.6); Wright-Bernet v. Commissioner of Internal Revenue, 172 F.2d 343 (C.C.A.6); Roth Office Equipment Co. v. Gallagher, 172 F.2d 452 (C.C. A.6); Loesch & Green Const. Co. v. Commissioner of Int. Rev., 211 F.2d 210 (C. A.6); Tank v. C. I. R., 270 F.2d 477 (C.A.6).

With regard to the finding of the trial court that the No. 63 stone was not dolomite, but "stone," it is to be emphasized that this finding was contrary to the uncontradicted testimony of an unusually well-qualified, expert witness, Dr. Kriege, that the No. 63 stone was a highsiliceous dolomitic limestone; and his explicit testimony on this point was that it was a calcium carbonate and a magnesi-

um carbonate. There is no testimony or is there the implication of any testimony in the record that it was not a calcium and magnesium carbonate. Unimpeached, uncontradicted testimony from a well-qualified, impartial witness should be accepted by the court, especially when the court has no knowledge or experience on which it could exercise an independent judgment. Wright-Bernet v. Commissioner of Internal Revenue, 172 F.2d 343 (C.C.A.6). Under the statute, calcium carbonate and magnesium carbonate are entitled to a 10% depletion allowance, instead of a 5% allowance as "stone."

In the light of the foregoing, it does not appear that this cause is to be resolved upon any issue of disputed fact or evidence with respect to the meaning of limestone o*̇r dolomite; but even if such were the case, then, in the language of Mr. Justice Story in Two Hundred Chests of Tea, Smith, Claimant, supra,* the weight of the evidence would be so strong that no court of justice would feel itself authorized to hold against the taxpayers on any such factual question that might be considered to be here presented.

Accordingly, it is my view that the judgments should be vacated and the cases remanded for entry of judgments entitling taxpayers to a 15% depletion allowance on their dolomitic products, and a 10% depletion allowance on the No. 63 limestone.

However, the majority views in the three opinions in this case require that the judgments of the district court be affirmed in part, and reversed in part, and that the cases be remanded for entry of judgments entitling taxpayers to a 10% depletion allowance on their dolomitic products, and a 10% depletion allowance on the No. 63 limestone.

SHACKELFORD MILLER, Jr., Chief Judge (dissenting).

The evidence in this case supports the finding of the District Judge that the stone deposits quarried by the taxpayers were (with one exception) relatively uniform, sedimentary, carbonate rocks and contained a minimum of 90 per cent of the mineral dolomite. They possessed proximate chemical analyses ranging as follows:

Calcium carbonate ....52–56 per cent
Magnesium carbonate..41–45 per cent
Impurities ..........3 per cent or less

The one exception was the so-called No. 63 stone from the Huntington quarry which possessed a proximate chemical analysis as follows:

Calcium carbonate ......33.82 per cent
Magnesium carbonate ...27.23 per cent
Impurities ............38.25 per cent

The District Judge was of the opinion that the word "dolomite" referred to a rock rich in magnesium carbonates and composed of 90 per cent or more of the mineral dolomite, and that the word "limestone" referred to a high calcium carbonate rock having a calcium carbonate content far in excess of the magnesium content and ranging up to 95 per cent. For a helpful discussion of this same question, see the opinion of the same Judge in Wagner Quarries Co. v. United States, 154 F.Supp. 655, 659–662. He pointed out in the present case that various authorities differed on the percentage of content of magnesium or calcium carbonates in order to arrive at a determination of whether the rock was dolomite or limestone. He found that the taxpayer's product, excepting the No. 63 stone, was a high grade "dolomite" but not "limestone" of chemical grade or metallurgical grade. In his opinion, reported at Erie Stone Co. v. United States, D.C., 181 F.Supp. 942, he points out why the ruling in Wagner Quarries Co. v. United States, supra, 154 F.Supp. 655, affirmed, 260 F.2d 907, C.A.6th, and relied upon by the appellants, is not controlling in this case. See also: Riddell v. California Portland Cement Co., 297 F.2d 345, 351, C.A.9th; Halquist v. Com-

* Ante, page 335.

missioner, 33 T.C. 304, 321–322, reversed on other grounds, 291 F.2d 49, C.A.7th.

The District Judge also found that the No. 63 stone from the Huntington quarry was not "dolomite" but was "stone." He stated that its potential use seemed to be limited to that of ballast and that it appeared to possess no other virtues. Dr. Kriege, appellants' expert witness, testified that the content of the rock dolomite varied widely in common usage so far as magnesium was concerned; that there was a wide diversity of opinion among the experts as to the magnesium carbonate that should be present before the rock qualified as dolomite; and that to quite an extent the use determined the definition of the stone because the users had developed their own terminology. He testified that to a person interested primarily in the use of the material for cement purposes it began to be dolomitic or a dolomite at five per cent, or ten per cent at the utmost, but that the user of the material for flux stone in blast furnaces, for example, would think in terms of nearer to forty per cent magnesium carbonate before it ever became a dolomitic limestone to him. The explanation for this was that magnesium carbonate was an impurity and a serious limitation in the making of cement, but that the magnesium carbonate content was a very definite benefit if it was used for blast furnaces. He testified as follows:

"Q. Now, doctor, I will ask you for your individual opinion as a man who has had as much experience in this subject as anybody in the United States; I want your opinion as to how much magnesium carbonate would be present in a dolomite rock or dolomitic rock in order to make it a dolomite in terms of trade and commerce? Give us your own personal views on that subject.

"A. In my own personal thinking, I find difficulty in thinking of a rock as a dolomite if it does not contain well over forty percent magnesium carbonate."

It appears to be agreed that the magnesium carbonate found in the company sample was only 27.23 per cent.

In my opinion, the findings of the District Judge are supported by the evidence, are not clearly erroneous and should be accepted on this review. United States v. Wagner Quarries Co., supra, 260 F.2d 907, 908, C.A.6th.

I would affirm the judgment of the District Court.

WEICK, Circuit Judge.

No. 63 stone which contained carbonates of 61.05 per cent was classified by the District Court, not as dolomite, but as stone and held entitled to the lowest depletion allowance of 5%. In my judgment, since this stone contained more than 50% of the mineral dolomite, it was entitled to a classification as dolomite with a 10% depletion allowance. Blue Ridge Stone Corp. v. United States, 170 F.Supp. 569 (D.C.Va., 1959).

The fact that the stone contained impurities of 38.25% means simply that it is a low grade dolomite. The statute does not distinguish between high and low grade dolomite. Either grade is entitled to a 10% depletion allowance.

I therefore agree with Judge McALLISTER that the District Court was in error in not classifying No. 63 stone as dolomite and that the judgment should be reversed with instructions to so classify it.

I am in agreement with Judge MILLER that the District Court was correct in classifying taxpayers' product containing in excess of 90% of the mineral dolomite as a high grade dolomite entitled to a 10% depletion allowance and that part of the judgment of the District Court should be affirmed.