The **WAGNER QUARRIES COMPANY,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

**Civ. No. 7486.**

United States District Court
N. D. Ohio, W. D.

Sept. 6, 1957.

———◆———

Shumaker, Loop & Kendrick, Toledo, Ohio, for plaintiff.

Ernest C. Friesen, Jr., Washington, D. C., Sumner Canary, U. S. Atty., Cleveland, Ohio, Clarence M. Condon, Asst. U. S. Atty., Toledo, Ohio, for defendant.

KLOEB, District Judge.

Plaintiff taxpayer seeks to recover certain income and excess profits taxes assessed and paid for the calendar year 1951.

The stipulated facts are found accordingly and are incorporated herein by reference.

The pertinent parts of the stipulation, filed May 27, 1957, are as follows:

Plaintiff is an Ohio corporation, with its principal office in the City of Sandusky, Erie County, Ohio, and it is engaged in the business of quarrying, processing and selling limestone and related minerals, with its quarry and place of business in said County and State;

This action involves the Federal income and excess profits tax returns filed by plaintiff for the calendar year 1951, and the payment of taxes for which recovery is sought was made to the District Director of Internal Revenue in Toledo, Ohio;

In the calendar year 1951, which was also plaintiff's fiscal year, plaintiff had a gross income from its sale of minerals mined from its property consisting of a

quarry in Erie County, Ohio, in the amount of $1,451,309.20;

In the tax return for the calendar year 1951, filed on or about March 5, 1952, plaintiff computed its deduction for percentage depletion to be in the amount of $217,696.38, computing said deduction at the rate of 15 percent on its gross income, and paid the tax due as shown thereon;

The Commissioner of Internal Revenue disallowed in part the percentage depletion deduction as computed, and determined a deficiency in tax in the sum of $78,149.69, plus interest;

The Commissioner allowed percentage depletion at the rate of 10 percent and 5 percent, respectively, for a part of the limestone sold by plaintiff, depending not upon the grade or quality of the limestone but upon the use made by the purchaser of the product. The Commissioner allowed rates of percentage depletion upon plaintiff's sales in determining this disallowance as follows:

| "Sales | Rate | Depletion |
|---|---|---|
| "Agriculture and chemical $ 334,062.65 | 10% | $ 33,406.27 |
| Metallurgical 249,374.20 | 15% | 37,406.13 |
| Stone 867,872.35 | 5% | 43,393.62 |
| $1,451,309.20 | | $114,206.02"; |

In the report of the Engineering Agent, John C. Stafford, dated February 3, 1954, addressed to the District Director of Internal Revenue, the foregoing sales were further broken down by Mr. Stafford as follows:

| "Sold for | Net Sales | Depl. Rate | Depletion |
|---|---|---|---|
| "Agr. Sizes No. 8 & 10 | $ 140,969.40 | 10% | $ 14,096.94 |
| Agr. Sizes No. 7 'Est.' | 50,000.00 | 10% | 5,000.00 |
| Fertilizer Co. Various Sizes | 3,801.00 | 10% | 380.10 |
| Cement Mfg. | 139,292.25 | 10% | 13,929.23 |
| Glass & Soda Ash | 54,374.20 | 15% | 8,156.13 |
| Flux, Iron & Steel 'Est.' | 195,000.00 | 15% | 29,250.00 |
| Constr. stone | 867,872.35 | 5% | 43,393.62 |
| Total | $1,451,309.20 | | $114,206.02"; |

On April 7, 1955, plaintiff filed its claim for refund and, on November 28, 1955, plaintiff filed a revised claim for refund;

The amount of plaintiff's claim for percentage depletion is not in excess of 50 percent of the net income of plaintiff from its property in that year;

On December 6, 1955, the District Director denied plaintiff's claim and revised claim, and plaintiff now asserts that it is entitled to recover the sum of $91,589.29, with interest at 6% per annum from February 8, 1955;

If it is ultimately held and adjudged that plaintiff is entitled to recover from defendant on its first claim for relief, then the plaintiff shall be entitled to recover also on its third claim for relief in the amount of $15,010.91, with interest at 6% per annum from February 8, 1955.

The statute involved in the case is 26 U.S.C. § 23(m) and § 114(b) (4) (A) (iii), and the pertinent parts of the statute are as follows:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

"(m) Depletion. In the case of mines, oil and gas wells, other natu-

ral deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; · such reasonable · allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \*

"For percentage depletion allowable under this subsection, see section 114(b), (3) and (4)."

\* \* \*

"§ 114. Basis for depreciation and depletion.

\* \* \* \* \* \*

"(b) Basis for depletion.

\* \* \* \* \* \*

"(4) Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits.

"(A) In general. The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

"(i) in the case of sand, gravel, slate, stone, \* \* \* 5 per centum,

"(ii) In the case of coal, asbestos, brucite, dolomite, magnesite, perlite, wollastonite, calcium carbonates, and magnesium carbonates, ·10 per centum,

"(iii) in the case of metal mines, aplite, bauxite, \* \* \* metallurgical grade limestone, chemical grade limestone and potash, 15 per centum, and

"(iv) in the case of sulfur, 23 per centum, of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rent or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph."

The pertinent parts of the Regulation involved in the case, otherwise known as Treasury Decision 6031, promulgated on July 15, 1953, about sixteen months after plaintiff had filed its income and excess profits tax return for the year 1951, read as follows:

"For the purposes of this section, the minerals indicated below shall have the following meanings:

\* \* \* \* \* \*

"Calcium carbonates . . . . . . . . . Miscellaneous limestones and other calcium carbonate rocks (not specifically provided for at a 5 percent or 15 percent rate of percentage allowance) such as cement rock and limestone used or sold for use in soil treatment. This classification does not include rock or minerals used or sold for use as ballast, road making, concrete aggregates or other purposes for which chemical composition is not a major requirement.

\* \* \* \* \*

"Limestone, chemical grade .. Limestone used or sold for use in the chemical trades.

"Limestone, metallurgical grade . . . . . . . . . . . . . . . . . . Limestone used or sold.for use in the production of metals."

It is to be noted that only the calendar year 1951 is involved in this case, and only the years 1951, 1952 and 1953 are affected by the decision of the case. The Amendment to the Code heretofore quoted became effective in 1951, and was then amended by the Congress effective in 1954, 26 U.S.C.A. §§ 611, 613(b), whereby Congress adopted a modified end-use test in connection with the percentage depletion allowance. The 1954 Code, therefore, applies to the years subsequent to 1953, and the decision arrived at in this case will not affect these subsequent years.

The parties appear to be in substantial agreement on the two major issues that are presented:

First, whether the Commissioner's Regulation, otherwise known as Treasury Decision 6031, to the extent that it sets up an "end-use" test instead of a "grade" test for percentage depletion is inconsistent with the statute, and, therefore, unreasonable, void, and of no effect, and,

Second, whether the limestone sold from plaintiff's quarry in the year 1951 was of chemical or metallurgical grade within the meaning of the statute.

■ In connection with the first issue presented, we are convinced that the language of the statute is clear and unambiguous and that the legislative history of the statute and the adjudicated cases support a conclusion that Treasury Decision 6031 is invalid and of no effect. Busey v. Deshler Hotel Co., 6 Cir., 130 F. 2d 187, 142 A.L.R. 563; Slough v. Commissioner of Internal Revenue, 6 Cir., 147 F.2d 836.

The first Act to provide for percentage depletion, as distinguished from cost and discovery depletion, was enacted in the year 1926, Revenue Act 1926, § 204, 26 U.S.C.A. Int.Rev.Acts, page 151, and in the succeeding years the Congress, in adding various minerals to a long list of minerals on which a depletion allowance was fixed, continued to employ the percentage depletion allowance in the enactment of the 1954 Act. At no time until the year 1954 do we find the Congress employing an end-use test. We do find that, on July 22, 1949, the Acting Secretary of the Treasury in a letter directed to the Chairman of the Committee on Ways and Means of the House of Representatives opposed the adoption of an end-use test that had theretofore been suggested in a bill filed by a Member of the House. (Plaintiff's Exhibit 49.) The ground of the objection to the adoption of an end-use test, as set forth in this letter, appeared to be that such a test would raise administrative and compliance problems which would be fairly serious.

In arriving at the conclusion that the end-use test adopted by the Commissioner is illegal, we are supported by the case of Virginian Limestone Corp. v. Commissioner, 1956, 26 T.C. 553, and by Spencer Quarries, Inc., 1956, 27 T.C. 392.

In the Virginian Limestone case, 26 T. C. at page 2805, we find the following:

"* * * The provisions of the statute here involved are specific and free from ambiguity. In such situation, there is no room for an interpretation, by the Commissioner or by the courts, which would vary (either upward or downward) the stated rates for specifically identified minerals, which Congress has provided."

In the Spencer Quarries case, we find the following:

"As to the end-use principle, we said in Virginian Limestone Corporation, supra, at page 560:

"'We find nothing in the applicable statute, or in its legislative history, which tends to show any intention of Congress that, where a mineral has therein been specifically provided for at a stated rate, such rate may be varied by the Commissioner in accordance with the end-use to which the product is put by the taxpayer's customers. An allowance for depletion has been recognized in

our revenue laws since 1913, based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit, and that a deduction from gross income should be allowed to compensate for such exhaustion. All of the revenue acts enacted prior to 1954, in which such allowance was provided, speak in terms of the wells, mines and natural deposits which are subject to the exhaustion, as distinguished from the products therefrom or the uses to which such products may be put by customers. * * '

"We think the provisions of the statute are specific and free from ambiguity. Under the circumstances, there is no room for interpretation which would permit the Commissioner to vary the stated rates either upward or downward."

We conclude, therefore, that the Commissioner had no authority and no right to arbitrarily change the grade test prescribed by Congress to an end-use test as provided for in Treasury Decision 6031, and the action, therefore, of the Commissioner is illegal, void and of no effect.

The second issue presented in this case as to whether the limestone sold from plaintiff's quarry was actually of chemical or metallurgical grade within the meaning of the statute presents an issue that is not found in either the Virginian Limestone case or the Spencer Quarries case, supra.

In the Virginian Limestone case, there seemed to be no question but that the chemical content of the mineral warranted it being classified as "dolomite". It had a high magnesium carbonate content ranging from about 35 percent to 42 percent, and the average chemical composition, stated in terms of carbonates, was about 37 percent to 40 percent magnesium carbonate and about 52 percent to 56 percent calcium carbonate. The Commissioner in that case presented no testimony respecting the character of the

petitioner's rock. He neither affirmed nor denied that such rock was "dolomite".

In the Spencer Quarries case, the mineral involved was identified and classified as "quartzite", and the respondent Commissioner did not deny that the deposits in question were "quartzite" within the generally accepted meaning of that term.

In attempting to arrive at a proper meaning of the terms "chemical grade limestone" and "metallurgical grade limestone", we have turned first to the legislative history of the Act. Here we find little to guide us except that, in Senate Committee Report on the Internal Revenue Code of 1951 (2 U.S.Code Congressional and Administrative Service, 82d Congress, First Session, 1951, pages 2006–2008), we find the following:

"The names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning."

The parties in the case are pretty well agreed that there is no commonly understood commercial meaning. Dr. Oliver Bowles, an expert witness for the defense, seemed to put the matter rather clearly when he spoke as follows (R. 345):

"Q Now, I realize, Dr. Bowles, that we have been talking about chemical grade stone and it is easy to pick up the term. Is that a term commonly used or understood in the industry?

"A 'Chemical grade' is, I think, a term Congress dug up from somewhere that I don't know. It is not generally used. We speak of chemical and metallurgical limestone, but in general in our publications the word 'grade' does not appear. However, I think it means the same thing. I understood chemical limestone to be chemical grade limestone."

Dr. Kenneth Landes, an expert defense witness, was somehow accredited with

having asserted that, in his appearances before the House Committee in 1949 and 1950, he had coined the phrases "chemical grade limestone" and "metallurgical grade limestone". However, on cross examination, he very modestly denied that he should receive any credit for coining these phrases for the benefit of Congress.

During the trial of the case, three expert witnesses testified on the question of whether the limestone sold from plaintiff's quarry was of chemical or metallurgical grade within the meaning of the statute. Dr. H. F. Kriege testified for plaintiff and Dr. Kenneth Landes and Dr. Oliver Bowles testified for the defense. All of these gentlemen were men of great competence in their various fields of endeavor. Each attempted to define the terms in question.

Dr. Kriege testified as follows (R. 237):

"A chemical grade limestone is a limestone whose chemical composition and physical characteristics are such as to make it suitable for use in some or most chemical industrial applications."

"I would consider a metallurgical grade limestone a limestone of such chemical and physical qualities and characteristics that it would lend itself to use in any of the metallurgical applications."

Dr. Landes seemed to be of the opinion that a limestone of chemical grade was a limestone suitable for use only in a chemical industry that was engaged in the production of chemical products.

Dr. Bowles testified that chemical limestone was a high-purity limestone suitable for specialized chemical uses (R. 336), and that chemical limestone was required for certain chemical and industrial uses such as the manufacture of alkali, calcium carbide, glass, paper and sugar (R. 334). He was of the opinion that these industries would require a minimum total carbonate content of calcium carbonate and magnesium carbonate of 96 percent to 99 percent, and he felt that chemical limestone, as used by the industry customarily requiring chemical limestone, is one of high quality consisting of a minimum of 95 percent total carbonates.

Dr. Landes and Dr. Bowles appeared to be in agreement that a chemical grade limestone and a metallurgical grade limestone should be a limestone of a total carbonate content of 95 percent or more.

Honorable Richard M. Simpson, M.C., a member of the Committee on Ways and Means of the House of Representatives, directed a letter to the Secretary of the Treasury on July 12, 1953 (Government Exhibit B), which reads in part as follows:

"It is also my belief that a definition of chemical and metallurgical grade limestone can be written which has the effect of limiting 15 percent percentage depletion to high quality deposits, and which will be satisfactory to both the limestone industry and the Government. A suggested definition is as follows:

"'Chemical and Metallurgical Grade Limestone is defined to mean calcium or magnesium limestone containing an aggregate of not more than 5 percent by weight of oxides of silicon and aluminum.'

"In the light of the foregoing, I strongly urge that the applicable Treasury Regulations, adopting an 'end use' test be stricken and that regulations authorizing a grade test (along lines similar to the proposed definition) be substituted. My feeling that a satisfactory solution can be reached is heightened by the fact that since enactment of the Revenue Code of 1954 only three taxable years, 1951, 1952 and 1953 are involved."

A number of tests were made of plaintiff's limestone and the results of these tests are a part of the record. Perhaps the most representative tests are those made by Dr. Kriege in 1949, as disclosed by Plaintiff's Exhibits 55 and 56, and the

tests made by the Columbia Chemical Division of the Pittsburgh Plate Glass Company in 1951, as disclosed by Plaintiff's Exhibits 23 and 24. The average of Dr. Kriege's 1949 analyses is set forth in Plaintiff's Exhibit 56, as follows:

|  | "Southeast Face | Southwest Face |
|---|---|---|
| "Calcium Carbonate | 82.46 | 84.42 |
| Magnesium Carbonate | 10.20 | 8.79 |
| Silica | 3.45 | 3.28 |
| Total Neutralizing Power | 94.91 | 95.02". |

The analyses of the Columbia Chemical Division, figured in terms of carbonates, is as follows:

Exhibit 23 discloses the following:

| "Calcium Carbonate | 86.4 |
|---|---|
| Magnesium Carbonate | 9.5 |
| Total Carbonates | 95.9". |

Exhibit 24 discloses the following:

| "Calcium Carbonate | 83.6 |
|---|---|
| Magnesium Carbonate | 11.2 |
| Total Carbonates | 94.8". |

These tests average a lower silicon and aluminum content than the 5 percent suggested by Mr. Simpson in Government's Exhibit B.

In Government's Exhibit A, which is a treatise entitled "Metallurgical Limestone Reserves in the United States", by Dr. Landes, which exhibit was incorporated in the hearings before the Ways and Means Committee of the House of Representatives, we find the following on page 10 thereof:

"Ohio ranks third in the production of metallurgical limestone, and first in lime. Four formations, the Brassfield, Niagaran, Columbus, and Vanport, are worked for metallurgical stone.

＊　　＊　　＊　　＊　　＊　　＊

"*The Niagara.* Niagaran rocks, also known as Peebles, Lilley, Cedarville, and Guelph, crop out widely in western Ohio. Most active quarrying is in Ottawa, Sandusky, Seneca, and Wood Counties. ＊　＊　＊

"*Columbus formation.* The Columbus, an A–2 stone, occurs along a belt which extends from Pickaway County in southern Ohio northward to Kelley's Island in Lake Erie. It is the outstanding blast furnace stone produced in the state. ＊　＊　＊"

An examination of the map discloses that the plaintiff's quarries come very well within the area that Dr. Landes has described as containing and producing "metallurgical stone".

In the opinion of Dr. Landes, substantially 80 percent of all metallurgical grade limestone is consumed in the operation of blast furnaces for the making of pig iron, and a small percent is used in the operation of open hearth furnaces for the making of steel. He agrees that in recent years the steel manufacturers are turning more and more to the use of a limestone containing a greater magnesium carbonate content than they did in years gone by. He would, therefore, allow a greater tolerance in the computation A–2, as shown on page 1 of the Government's Exhibit A, in the magnesium content. Plaintiff's product would, therefore, appear to fall substantially within the grade A–2 which Dr. Landes states would constitute a limestone satisfactory for metallurgical or chemical uses.

The record discloses that substantially 40 percent of the limestone sold from plaintiff's quarries during the year 1951 was utilized for chemical and metallurgical purposes, and in chemical purposes we include the use of the limestone for agricultural purposes.

The required standards of quality in a limestone appear to vary with the industry under consideration and hence it is difficult, if not impossible, to arrive at a commonly understood commercial

meaning of chemical or metallurgical grade limestone. Some chemical users require very high standards and some require standards that are not so high. The statute does not differentiate between grades. Congress has left no criterion to guide us in determining what they mean by the phrases "chemical grade" and "metallurgical grade" limestone. Assisted by the opinions of experts such as those who have testified in this case, we are somehow left to the employment of common sense in determining what the Congress had in mind. Commissioner of Internal Revenue v. Caulkins, 6 Cir., 144 F.2d 482; Tri-Lakes S. S. Co. v. Commissioner, 6 Cir., 146 F.2d 970. Certainly they did not have in mind a grade of limestone suitable only for use by an industry that requires extremely high standards such as the limestone mined in the area on the east coast of Michigan between Alpena and St. Ignace, where the calcium carbonate content is 95 percent or more. If this is what the Congress had in mind, then I believe they would have so said, for this grade of limestone is exceedingly scarce and is rarely found in available quantities. If this is what the Congress had in mind, they would have said so or the legislative history would so indicate. On the other hand, they could not have had in mind all limestone mined in the United States, much of such low grade as to be used, if at all, for chemical or metallurgical purposes, under extremely adverse and difficult conditions. What we are here striving for is a fair and reasonable determination of the intent of Congress in listing chemical grade and metallurgical grade limestone under a 15 percent depletion allowance. Counsel on both sides may well, in their ardor, reach for the extreme at both ends of possible uses. It is the duty of the Court, in the absence of a commonly understood commercial meaning, to arrive at a reasonable interpretation of the intent of Congress in employing these phrases.

Here we have a quarry that sold 40 percent of a very large output of limestone, during the year 1951, to various industries that used the limestone for chemical and metallurgical purposes. The grade or quality of the limestone was sufficient to induce these industries to purchase it and use it for chemical and metallurgical purposes. The output of plaintiff for the year in question appears to have been rather broadly used for these purposes.

It is true that availability plays an important part in the selection of limestones by a purchaser, and hence we may find a situation where this consideration predominates over the desire or necessity for a higher grade of limestone in the requirements of the particular industry. In such a case, we may find a limited quantity purchased for an apparent chemical use. This was the case in Spencer Quarries, supra, where substantially all of the output of the mine was used as crushed stone, rock and riprap for the construction of roads, highways, earth dams and for use as concrete aggregate. A very small percent was purchased by the National Foundry Sand, a company that made sales to ultimate users who used the mineral for refractory and other purposes for which the deposit was peculiarly adapted by reason of its chemical and physical characteristics. Such was the case also in Virginian Limestone, supra, where but 3.14 percent of the total tonnage sold in the year in question was utilized as a flux in metallurgical processes.

Here we do not have an isolated purchase but we have purchases in substantial amounts that are used in chemical and metallurgical industries.

In Plaintiff's Exhibit 57, which is the report of the engineer employed in the Internal Revenue service, dated February 3, 1954, which report was made by the engineer after an inspection of plaintiff's quarry and of plaintiff's records, we find the following:

"* * * The limestone has a high calcium content and is sold for use as flux stone, chemical purposes,

soil treatment, cement manufacture and construction stone."

We are inclined to agree with this statement.

Defendant in its argument would classify plaintiff's product as stone and as calcium carbonate. Classified as stone, the depletion allowance would be 5 per cent, and classified as calcium carbonate, the depletion allowance would be 10 per cent. Defendant says: "Since the bulk of the taxpayer's material was within the commonly understood commercial meaning of the word 'stone' the taxpayer's deposit was a stone deposit within the meaning of the statute." (Brief of Defendant, p. 35), and, on page 36, we find the following: "Nearly all of the taxpayer's product which was not sold for road construction was utilized for its calcium carbonate content in cement manufacture or for its calcium carbonate equivalent in agricultural soil treatment. To the extent it was so utilized it comes within the Congressional language 'calcium carbonates.'"

We cannot agree with the classifications suggested by defendant. We are of the opinion that plaintiff's entire output from its quarry during the year 1951, all drawn from a common surge-pile, was chemical grade limestone and metallurgical grade limestone, as contemplated by Congress, and should receive a depletion allowance of 15 percent as designated by Congress in the Amendment to the Act.

Plaintiff is, therefore, awarded a judgment against defendant in the sum total of $106,600.20, plus interest thereon at 6 percent per annum from February 8, 1955, as prayed for.

Findings of fact and conclusions of law drawn in accordance with this opinion may be prepared by plaintiff and lodged with the Court within ten days. Within fifteen days thereafter defendant may note its exceptions or suggested additions thereto.