William O. Faylor and Kathryn Faylor v. Commissioner.
Faylor v. Commissioner
Docket No. 65255.
United States Tax Court
T.C. Memo 1963-190; 1963 Tax Ct. Memo LEXIS 153; 22 T.C.M. (CCH) 918; T.C.M. (RIA) 63190; July 16, 1963
Norman A. Peil, Jr., and Michael Kivko, 430 Market St., Sunbury, Pa., for the petitioners. Dennis C. DeBerry and Max J. Hamburger for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency in petitioners' *154 income tax for the calendar year 1953 in the amount of $82,828.80. Certain minor adjustments have not been contested, and the issues remaining for decision are: (1) whether petitioners are entitled to deduct as interest certain payments made during 1953 to Republic National Life Insurance Company in the total amount of $91,806.72; and (2) whether the limestone mined by petitioners' partnership in its fiscal year ending in 1953 qualified for the 15 percent depletion rate provided for "chemical grade limestone" and "metallurgical grade limestone." Findings of Fact Some of the facts have been stipulated and are so found. William O. Faylor and Kathryn Faylor are husband and wife and are residents of Middleburg, Pennsylvania. They filed a joint Federal income tax return for the year 1953 with the director of internal revenue at Philadelphia, Pennsylvania. During the year 1953 petitioner William O. Faylor (hereinafter referred to as Faylor) was an executive of Middlecreek Paving, Inc., and Middlecreek Construction Company in Middleburg, Pennsylvania. During the same year petitioners, Faylor and Kathryn Faylor, were copartners engaged in the business of quarrying and processing limestone *155 for sale under the name of Faylor Lime & Stone Company. Issue 1 In the spring of 1953, Faylor conferred with an insurance agent who discussed with him the desirability of purchasing annuities which could be financed through borrowing. The agent pointed out the tax benefits to be obtained through the deduction of interest paid on such borrowings and showed Faylor copies of a number of favorable unpublished internal revenue letter rulings relating to the deduction of interest paid on loans to be used to obtain annuities. None of these rulings was addressed to Faylor, but all were addressed to other taxpayers whose names were deleted. The possibility of providing for the future of his three children, all of whom were teenagers, appealed to Faylor. He felt that the program outlined by the agent fitted his situation well because it could be commenced with a minimum cash investment on his part and therefore would not jeopardize his businesses by taking from them cash needed in their operation. Although not the only consideration, the assumed deductibility for Federal tax purposes of "interest" payments on "loans" was a crucial factor in a decision made by Faylor to proceed with the *156 program suggested to him. Pursuant to said decision, Faylor executed applications late in October of 1953 for the purchase of three separate annual-premium nonparticipating deferred annuity contracts, in the face amount of $250,000 each, to be written by the Republic National Life Insurance Company of Dallas, Texas (hereinafter referred to as Insurance Company). Each of Faylor's three children, Sara L. Faylor, William O. Faylor, Jr., and Elizabeth K. Faylor, who were 14, 13, and 13 years of age, respectively, was to be designated as the annuitant under one of the three contracts. Faylor, who was 42 years of age at the time, was to be named the owner of each contract, reserving all rights under the same. The applications, accompanied by Faylor's personal check dated October 29, 1953, in the amount of $30,000, were sent to the insurance agent, who in turn forwarded them to Insurance Company's general agent. The $30,000 represented one year's advance premium of $10,000 on each of the annuity contracts. Pursuant to said applications Insurance Company issued three annuity contracts dated November 6, 1953, as follows: First
Monthly
Contract
Payment
Life Annuity
No.
Annuitant
to Annuitant
Provided
112002
Sara L. Faylor
Nov. 6, 1994
$2,798.16
112003
William O. Faylor, Jr.
Nov. 6, 1994
2,949.34
112004
Elizabeth K. Faylor
Nov. 6, 1994
2,764.11
*157 Faylor was named the owner of the contracts, all of which were forwarded to Philadelphia National Bank (hereinafter referred to as PNB) as agent for Insurance Company in handling the transaction. A number of steps were thereafter taken to complete the program outlined to Faylor by the insurance agent. All of the steps were part of an integrated and pre-conceived plan considered by Faylor to be a "package proposition." On December 1, 1953, Faylor borrowed the sum of $710,565 from PNB at 4 percent interest, giving his personal demand note therefor. He authorized PNB to pay the proceeds of said loan directly to Insurance Company. Faylor assigned to PNB as collateral security for said loan the three annuity contracts for which he had applied. The proceeds of the loan were deposited the same day by PNB directly to Insurance Company's account with PNB. Said proceeds were used by Faylor to prepay 40 annual premiums in full, on a discounted basis, on each of the three annuity contracts. Upon the payment of the $30,000 for the first year's premiums, plus the $710,565 for the following 40 years' premiums, all the annuity contracts were paid up. At that time the total of their cash *158 or loan values was $760,392. On or before December 1, 1953, Faylor had applied to Insurance Company to borrow the full $760,392 of cash values. He requested that $710,565 of that amount be paid directly to PNB and that the balance of $49,827 be paid to him. By loan agreements with Insurance Company executed by Faylor and dated December 1, 1953, Faylor promised to pay Insurance Company the total of $760,392, with interest payable in advance for each year on the anniversary date of the annuity contracts at the per annum rate of 4 percent. Assignments of the annuity contracts to Insurance Company as security for such payment were incorporated in the loan agreements, and it was provided that Faylor's obligations under the agreements could be enforced by Insurance Company only out of said contracts. As requested by Faylor, $710,565 of the resulting loans from Insurance Company was paid directly to PNB on December 1, 1953, and applied as and for full payment of the loan PNB had made to Faylor in that amount. PNB charged Faylor $78.95 as interest for one day on its loan, plus clearance charges of $473.71. Faylor received from Insurance Company the remaining total of $49,827 of the *159 proceeds of the loans made against the cash values of the annuity contracts. On December 1, 1953, Faylor also paid Insurance Company the sum of $59,141.61. This amount was denominated as "prepaid interest" from November 6, 1953, to November 6, 1955, on the loans made by Insurance Company. One-third of this amount was applied to each of the annuity contracts involved. In like manner Faylor paid Insurance Company an additional $32,665.11 on December 26, 1953, denominated as "prepaid interest" from November 6, 1955, to November 6, 1956. Petitioners claimed an interest deduction on their income tax return for the year 1953 for the total amount of $91,806.72 paid Insurance Company by Faylor during December of 1953 as "prepaid interest." As a result of the payments of "prepaid interest" on December 1 and 26, 1953, the cash values of the annuity contracts increased in amounts totaling $19,692 over the initial $760,392 total which had been borrowed by Faylor against the contracts. On December 28, 1953, Faylor borrowed $19,689 of said increase from Insurance Company, executing new loan agreements identical in all material respects to the initial loan agreements (which they replaced) except *160 for the new requirement of payments totaling $780,081. On December 28 of the following year, Faylor paid Insurance Company the sum of $66,971.04 as "prepaid interest" from November 6, 1956, to November 6, 1958, on the loans totaling $780,081. As a result of said payment in 1954, there was a further increase in the cash values of the annuity contracts in the total amount of $40,290. On December 28, 1954, Faylor borrowed from Insurance Company a total of $29,919 of the $40,290 increase in cash values generated by his payment of that date. Again he executed new loan agreements identical in all material respects to the previous loan agreements, except for the new requirement of payments totaling $810,000, the total amount of his outstanding loans from Insurance Company as of that date. Faylor did not borrow the full amount of the increase in cash values at that time because he wanted to create equities in the annuity contracts for his children. The following table shows the total cash values of the contracts and the total amounts of the loans made against said policies as of the times indicated: Total Cash
Total
Date
Values
Loans
December 1, 1953
$760,392
$760,392
December 28, 1953
780,084
780,081
December 28, 1954
820,374
810,000
*161 Faylor made no further "prepayments of interest" to Insurance Company after 1954 because, as a result of an examination of petitioners' income tax return for the taxable year 1953, he became aware that the Commissioner questioned the deductibility of the payments of "prepaid interest." If Faylor had believed in 1953 that the "prepaid interest" payments would not be deductible, he would not have adopted the particular program undertaken by him for purchasing annuity contracts. On November 2, 1958, Faylor, as owner of the annuity contracts, converted each as of November 6, 1958, to paidup deferred annuities which would provide installment refund annuities to each of his three children as follows: Monthly
To Begin at
Contract No.
Annuity
Annultant's Age
112002
$33.05
55
112003
30.78
54
112004
32.63
54
On December 10, 1958, the annuity contracts were irrevocably assigned to the respective annuitants thereunder. Said policies were still in force at the time of trial of this case. In 1953, Faylor's purported purchase of the annuity contracts, borrowing of funds from Insurance Company, and "prepayment of interest" had no economic or commercial substance *162 apart from an expected tax benefit. Issue 2 Faylor Lime & Stone Company, petitioners' partnership engaged in the quarrying and processing of limestone, filed its Federal income tax returns on an accrual basis for fiscal periods ending April 30 of each year. During its fiscal year ending in 1953, the partnership operated a limestone quarry located at Union Township, Union County, Pennsylvania, adjoining the Village of Winfield, pursuant to a lease agreement dated January 23, 1951. The quarry was operated by the partnership as an open-pit mine. The limestone deposit, a geological formation known as a Helderberg formation (consisting mainly of fossil deposit), was quarried from east to west, and in 1953 the open pit was about 1500 feet in length. In the mining operation the over-burden, consisting of clay and dirt covering the deposit, was removed. After the over-burden was cleared, the deposit was drilled and the loosened limestone was loaded from the quarry floor onto trucks and transported to a crushing plant located on the quarry floor. There it was crushed to reduced sizes, screened, and in some instances washed and dried. The limestone in the quarry worked by the partnership *163 was of a chemical content which was constant to a very high degree throughout the formation. It was sold interchangeably as limestone for agricultural purposes or as roadstone. No segregation based on the chemical content of the quarried stone was made by by the partnership, and the determination of the use to be made of stone sold was not based on any variations in the quality or chemical content of the stone quarried. No chemical or other matter was added to the limestone during the above-described processing. For its taxable year ending in 1953, the partnership's gross income and net income from the sale of limestone for agricultural limestone and roadstone were as follows: Agricultural
Roadstone
Limestone
Total
Gross income
$227,568.41
$146,929.83
$374,498.24
Deductions
206,280.22
56,708.53
262,988.75
Net income
$ 21,288.19
$ 90,221.30
$111,509.49
Agricultural limestone is used in soil conditioning to neutralize acidity in soil. In such capacity the limestone causes a chemical change in the soil, converting an acid condition to an alkaline condition. It also is used to supply soil with calcium and magnesium, important elements for *164 plant growth. It is the chemical content of limestone that gives it value for these purposes, and stone from the quarry operated by petitioners has been used for such agricultural purposes in Pennsylvania since some time prior to 1900. In 1953 the United States Department of Agriculture analyzed 32 samples, taken at various times throughout the year, of the limestone quarried by the partnership. The results of these analyses indicate that the average calcium oxide equivalent of this limestone was 49.1 percent. When coupled with the fact that there is a fairly constant ratio between the calcium oxide and magnesium oxide contents of the limestone quarried by the partnership, these analyses indicate that the limestone taken from the quarry in 1953 contained a combined calcium carbonate and magnesium carbonate content of approximately 86.9 percent. Chemical analyses of limestone quarried by the partnership were made by the Department of Agriculture of the Commonwealth of Pennsylvania during the years 1953, 1960, 1961, and 1962. These analyses were made in terms of calcium oxide and magnesium oxide contents, which are convertible by established chemical formulae to calcium carbonate *165 and magnesium carbonate contents. [1]
The chemical analyses of the partnership's limestone made by the Commonwealth of Pennsylvania with respect to the samplings taken by it disclosed the following: Year of
No. of Sam-
Calcium
Magnesium
Calcium
Magnesium
Total
Sampling
Plings Tested
Oxide
Oxide
Carbonate
Carbonate
Carbonates
1953
No. 1
44.41%
2.25%
79.27%
4.71%
83.98%
1960
No. 1
46.06
2.45
82.22
5.13
87.35
1960
No. 2
46.28
2.11
82.61
4.41
87.02
1961
No. 1
48.71
1.54
86.95
3.22
90.17
1961
No. 2
48.44
1.59
86.47
3.33
89.80
1961
No. 3
46.08
2.11
82.25
4.41
86.66
1962
No. 1
46.64
2.09
83.25
4.37
87.62
1962
No. 2
49.87
2.19
89.02
4.58
93.60
An analysis of limestone taken from the quarry operated by the partnership was made in 1955 by American Testing Laboratories, Inc., of Lancaster, Pennsylvania. That analysis indicated a calcium carbonate content of 87.41 percent and a magnesium carbonate content of 2.46 percent, or a combined carbonate content of 89.87 percent. The limestone sold *166 by the partnership in its fiscal year ending in 1953 was not metallurgical grade limestone or chemical grade limestone within the meaning of section 114(b)(4)(A) of the Internal Revenue Code of 1939. Opinion Issue 1 Petitioners object to a determination by respondent that Faylor's payments to Insurance Company in 1953 of "prepaid interest" in the amount of $91,806.72 are not deductible under section 23(b) [2] of the Internal Revenue Code of 1939. [3]
We agree with respondent's contention that the resolution of this issue is governed by the Supreme Court's decision in Knetsch v. United States, 364 U.S. 361 (1960). The holding in that case is adverse to petitioners. See also Weller v. Commissioner, 270 F. 2d 294 (C.A. 3, 1959), affirming 31 T.C. 33 (1958) and W. Stuart Emmons, 31 T.C. 26 (1958), certiorari denied 364 U.S. 908 (1960); *167 Pierce v. Commissioner, 311 F. 2d 894 (C.A. 9, 1962), affirming 37 T.C. 1039 (1962), certiorari denied - U.S. - (May 13, 1963); William R. Lovett, 37 T.C. 317 (1961), on appeal (C.A. 5, February 21, 1962); A. A. Helwig, 37 T.C. 1046 (1962); Gerstell v. Commissioner, 319 F. 2d 131 (C.A. 3, June 26, 1963), affirming a Memorandum Opinion of this Court. Labels assigned to payments by the parties thereto are not conclusive of tax consequences. Joseph H. Bridges, 39 T.C. 1064 (March 27, 1963), on appeal (C.A. 4, May 20, 1963). "The incidence of taxation depends upon the substance of a transaction." Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945). Faylor was issued three annuity contracts with face amounts totaling $750,000 which, taken together, would pay from maturity until the deaths of the respective annuitants a total amount of $8,511.61 per month. When the program is analyzed apart from its tax consequences, it is found that in 1953 Faylor paid Insurance Company $740,565 ($30,000 for the first year's premiums plus the $710,565 proceeds of the loan from PNB for the remaining premiums *168 at a discounted rate) in acquiring the contracts; he also paid a total of $91,806.72 as "interest." His total payments in 1953 were thus $832,371.72. Against this he "borrowed" a total amount of $780,081 in 1953, leaving him out-of-pocket a total of $52,290.72 for the year in question. For this net cost he had acquired three annuity contracts with cash values totaling $3 at the end of the year. In 1954 Faylor paid an additional $66,971.04 as "prepaid interest" and borrowed $29,919. This left him out-of-pocket $37,052.04 for 1954 and a total of $89,342.76 for 1953 and 1954 combined. For this total before-tax net cost, petitioner had obtained annuity contracts with total combined cash values of $10,371 at the end of 1954. No further transactions occurred, and the contracts were converted in 1958 (their cash values having remained constant) to paid-up policies which would pay a combined total of only $96.46 monthly after maturity beginning at annuitants' ages 54 and 55, until payments should cease upon the deaths of the respective annuitants. It is clear that, apart from tax considerations, these transactions taken together lacked economic or commercial substance and significance, *169 and it is now axiomatic that if a taxpayer enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it. Knetsch v. United States, supra.
Because of the lack of commercial or economic substance to the program, none of the payments made by Faylor to Insurance Company in 1953 was "interest" on "indebtedness" within the meaning of section 23(b). Accordingly, the deduction cannot be allowed. Knetsch v. United States, supra; Pierce v. Commissioner, supra. Petitioners argue that there was substance to the transactions entered into by Faylor. They contend that, whereas the Supreme Court found a net cash value of $1,000 to be "a relative pittance" in Knetsch, the total net cash value of $10,371 built up during the second contract year by Faylor's not having borrowed the full amount of the increases in cash values resulting from the "prepayment of interest" in 1954 renders this case different. The difference is one we find to be of insufficient degree to require a different result. The principles annunciated in the cases cited dictate our holding for respondent on this issue. *170 Issue 2 The percentage of the partnership's gross income from its mining operation which may be deducted for its fiscal year ending in 1953 as depletion, pursuant to section 23(m), [4] is set forth in section 114(b)(4)(A)[5] as amended by the Revenue Act of 1951. [6]
*171 The partnership claimed on its income tax return, and petitioners contend here, that the limestone quarried by Faylor Lime & Stone Company was "chemical grade limestone" or "metallurgical grade limestone," entitled to a 15 percent rate of depletion. Respondent determined that a 5 percent rate was applicable to that portion of the partnership's limestone that was sold for use as roadstone and that a 10 percent rate was applicable to the portion sold for use as agricultural limestone. Respondent now concedes that the end-use test has been rejected by this Court and is no longer valid, [7] and now contends that the proper depletion rate for the limestone quarried by the partnership is the 10 percent rate provided for calcium carbonates. The parties are in agreement that the 10 percent rate is applicable in this case if the partnership's limestone is not found to have been "chemical grade limestone" or "metallurgical grade limestone" within the meaning of those terms in section 114(b)(4)(A)(iii), supra. *172 The meaning of the terms "chemical grade limestone" and "metallurgical grade limestone" [8] has been the subject of a number of judicial inquires, which have been made under the handicap of little efficacious Congressional guidance. The relevant legislative history provides only that "[the] names of all the various enumerated minerals are of course intended to have their commonly understood commercial meaning." S. Rept. No. 781, 82d Cong., 1st Sess., p. 38 (1951). Petitioners urge that there is no such commonly understood meaning for the term "chemical grade limestone." Their expert witness so testified, saying it has differing meanings in different parts of the country and from industry *173 to industry; and, in the absence of record evidence to the contrary, we believe that this is so. We found the term to lack a "generally accepted and commonly understood commercial meaning" in Albin C. Halquist, 33 T.C. 304, 321 (1959), reversed on another issue, 291 F. 2d 49 (C.A. 7, 1961), certiorari denied 368 U.S. 930 (1961). See also Wagner Quarries Company v. United States, 154 F. Supp. 655 (N.D. Ohio, 1957), affd. 260 F. 2d 907 (C.A. 6, 1958). In such a situation the courts have found themselves "somehow left to the employment of common sense in determining what the Congress had in mind." Wagner Quarries Company v. United States, supra, at 662; see also H. Frazier Company v. United States, 302 F. 2d 521 (Ct. Cl., 1962). And most of the cases have been treated primarily as unrelated factual matters, to be decided solely on the basis of the records before the respective courts. However, various principles of law have gradually emerged from the decisions in the cases involving the issue presented here. These principles have taken the form of tests applied by the courts in determining *174 whether a given mineral is chemical grade limestone. These tests, whatever their specific formulation may be, are generally directed at the question of whether the chemical content of a given mineral is such that it can be used in chemical or metallurgical industries. See Wagner Quarries Company v. United States, supra; Centropolis Crusher Company v. Bookwalter, 168 F. Supp. 33 (W.D. Mo. 1958), reversed on another issue, 281 F. 2d 798 (C.A. 8, 1960). Although the end-use test has been rejected, [9] it is necessary in some cases to consider the potential end use of a mineral to arrive at a reasonable determination of whether it fits within the meaning of a certain term contained in the percentage depletion provisions of the Code. H. Frazier Company v. United States, supra; Riddell v. California Portland Cement Company, 297 F. 2d 345 (C.A. 9, 1962). This is particularly true with respect to the term "chemical grade limestone." The interpretation of "chemical grade limestone" as meaning a mineral with such a make-up as to render it suitable for use in chemical or metallurgical industries is given *175 support by T.D. 6031, 1953-2 C.B. 120, [10] since the rejection of that administrative interpretation was because of its emphasis on actual end use rather than suitability for use. Petitioners have the burden of proof in this case, and the record is far from convincing that the partnership's limestone could have been used in the chemical or metallurgical industries. Faylor said he thought it could have been so used, and the parties' experts expressed opposing opinions on the matter. The most meaningful indication, however, was Faylor's own testimony that he had had the limestone analyzed with the possibility of industrial sales in mind and had discussed this possibility with a sales agent, but that no such sales had been made. Some courts have verbalized tests designed to describe the chemical content required of a mineral that is so to be classified as "chemical grade limestone." These formulations appear to be efforts to carry the potential-end-use test one step closer to the degree of certainty that attaches to the definitions of most of the other minerals referred to in the percentage depletion provisions. Petitioners contend *176 that the proper test among these formulations is that defining "chemical grade limestone" as limestone having "a relatively high calcium carbonate content." For this proposition they cite Victorville Lime Rock Co. v. Riddell, an unreported case ( S.D. Calif. 1959, 4 A.F.T.R. 2d 5463, 59-2U.S.T.C. par. 9651), affd. 292 F. 2d 427 (C.A. 9, 1961). This has been said to be the proper definition in other cases also. See Centropolis Crusher Company v. Bookwalter, supra; Monolith Portland Cement Company v. United States, 168 F. Supp. 692 (S.D. Calif. 1958), findings and conclusions on this issue stricken on appeal as not necessary, to avoid potential future collateral estoppel, 269 F. 2d 629 (C.A. 9, 1959). Another case has varied this definition, saying the test is whether the limestone is of a relatively high combined carbonate [11] content. California Portland Cement Company v. Riddell, an unreported case ( S.D. Calif. 1958, 3 A.F.T.R. 2d 438, 59-1U.S.T.C. par. 9156), reversed on another issue 297 F. 2d 345 (C.A. 9, 1962).
*177 But even if we were to rely solely upon the definition urged by petitioners, we could not hold that the limestone quarried by the partnership was chemical grade limestone, because petitioners have not proved its calcium carbonate content to be "relatively high." The results of the various analyses made of the limestone indicate a range of from 79.27 percent to 89.02 percent calcium carbonate content, with an average of 84.38 percent. In terms of combined carbonate content, the range was from 83.98 percent to 93.6 percent and the average was 88.3 percent. But there is no showing whatsoever as to how the content of this limestone compares with that of other limestone generally, and surely the test established by this definition implies a determination of chemical content relative to other limestone rather than simply to all theoretical possibilities on a scale of 0 to 100 percent. [12]
*178 There is another aspect of chemical grade limestone that is additional to, although related to, the requirement of the existence of a certain chemical content, however. We refer to the requirement of relative freedom from impurities. See Jowa Limestone Co., 28 T.C. 881 (1957), affd. 269 F. 2d 398 (C.A. 8, 1959); United States v. Wagner Quarries Company, 260 F. 2d 907 (C.A. 6, 1958); Centropolis Crusher Company v. Bookwalter, supra; Rock Hill Quarries Co. v. United States, 217 F. Supp. 324 (E.D. Mo. March 19, 1963). Although this consideration may not be important in classifying certain other minerals (cf. Vulcan Materials Company v. Sauber, 306 F. 2d 65 (C.A. 7, 1962), certiorari denied 371 U.S. 912 (1962)), it is relevant to determinations that a given limestone is or is not of chemical grade. The case on which petitioners most rely, Lehigh Portland Cement Company v. United States, 198 F. Supp. 877 (E.D. Pa. 1961), supports this proposition. So does the testimony of petitioners' expert witness, who said that, if it were not for the presence of impurities, chemical and metallurgical *179 industries could sometimes use limestones with a lesser content of the desired chemicals than that content respondent urges should be the test of chemical grade limestone, and that it is usually impurities that render lower grade limestones not usable by these industries. Petitioners have made no showing as to the freedom of the limestone quarried by the partnership from those impurities that make limestone unusable by the chemical and metallurgical industries. In fact, when petitioners' expert witness was asked whether agricultural limestone (the name used by petitioners in reference to the partnership's limestone) was ever referred to as "chemical grade limestone," he answered that agricultural limestone was usually spoken of in terms only of "chemical content" and not of "chemical grade." After the end-use test had been thoroughly discredited, the Commissioner published T.B. 6510, 1960-2 C.B. 458, which changed the actual-end-use definition of "chemical grade limestone" previously contained in section 39.23(m)-5, Regs 118, [13] to one establishing a minimum combined carbonate content. [14] The definition now reads: [15]
Limestone, chemical, and metallurgical grade *180 - Limestone which contains a calcium carbonate and magnesium carbonate content totalling 95 percent or higher by weight. * * * The limestone quarried by the partnership is not chemical grade limestone within the definition contained in the applicable regulations as thus amended. This amendment to the regulations was not followed in the only case in which it has been cited. Lehigh Portland Cement Company v. United States, supra. However, the importance of the decision in Lehigh is minimal since the court there was compelled to accord virtually no credence to the testimony of the Commissioner's expert witness in support of the amended regulations. *181 We have found no case in which limestone substantially meeting the standards prescribed by T.D. 6510 has been held not to be chemical grade limestone. See Iowa Limestone Co., supra (95 percent calcium carbonate content); Wagner Quarries Company v. United States 154 F. Supp. 655 (N.D. Ohio, 1957), aff'd 260 F. 2d 907 (C.A. 6, 1958) (tests averaged 94.2 percent combined carbonate content); Centropolis Crusher Co. v. Bookwalter, supra (95 percent calcium carbonate content); Victorville Lime Rock Co. v. Riddell, supra (98 percent calcium carbonate content). More importantly, we have found no case apart from Lehigh Portland Cement Company v. United States, supra, in which limestone not substantially meeting said standards has been found to be chemical grade limestone. See California Portland Cement Company v. Riddell, an unreported case ( S.D. Calif. 1958, 3 A.F.T.R. 2d 438, 59-1 par. 9156), reversed on another issue 297 F. 2d 345 (C.A. 9, 1962) (80 percent average combined carbonate content); Rock Hill Quarries Co. v. United States, supra (90.4 percent average combined carbonate content); *182 Monolith Portland Cement Company v. United States, supra (85.2 percent calcium carbonate content). Petitioners contend that the test provided in T.D. 6510 is invalid as being arbitrary, the reason assigned being that it establishes a fixed minimum chemical content for a definition of words defined by the courts in relative terms. But there is nothing inherently inconsistent in the establishment of a specific standard for determining what is to be considered "relatively high" in a given context. Although we are ordinarily inclined to accord a discounted weight to regulations purporting to define terms used by Congress in a statute passed a considerable time prior to the adoption of such regulations, [16] we feel that this factor is counterbalanced here by the importance to be attached to regulations interpretative of admittedly ambiguous terms. See Koshland v. Helvering, 298 U.S. 441 (1936). *183 Regulations are not to be overruled unless it is found that they are unreasonable or plainly inconsistent with the statute, Commissioner v. South Texas Co., 333 U.S. 496 (1948), and we cannot contravene the regulations involved herein on the basis of the record before us. Petitioners also argue that the limestone quarried by the partnership must be found to be chemical grade limestone because of the fact that its use for agricultural purposes is based on its chemical value in soil conditioning. For the reasons set out above we do not agree that every limestone that may be used primarily for any chemical it may contain in some degree is "chemical grade limestone." Viewing this record as a whole, we cannot hold that the limestone in question is chemical grade limestone or metallurgical grade limestone within the meaning of section 114(b)(4)(A)(iii). The 10 percent depletion rate provided for calcium carbonates, and now agreed to by respondent, is therefore applicable to it for the year in question. Decision will be entered under Rule 50. Footnotes
1. Calcium oxide (X) 1.785 = calcium carbonate; magnesium oxide (X) 2.092 = magnesium carbonate.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(b) Interest. - All interest paid or accrued within the taxable year on indebtednes, * * * ↩
3. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1939.↩
4. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(m) Depletion. - In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion * * * For percentage depletion allowable under this subsection, see section 114(b), (3) and (4)↩. 5. SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION. (b) Basis for Depletion. - * * *
(4) Percentage Depletion for Coal and Metal Mines and for Certain Other Mines and Natural Mineral Deposits. - (A) In General. - The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be - (i) in the case of sand, gravel, slate, stone * * *, 5 per centum, (ii) in the case of * * * calcium carbonates, and magnesium carbonates, 10 per centum, (iii) in the case of * * * metallurgical grade limestone, chemical grade limestone, * * * 15 per centum, * * * ↩
6. 65 Stat. 452.↩
7. In the early cases under section 114(b)(4)(A) involving the issue here before us, respondent contended that the applicable percentage depletion rate was to be determined by the use to be made of the material mined rather than its inherent chemical make-up. This accorded with T.D. 6031, 1953-2 C.B. 120, which amended sec. 29.23(m)-5, Regs. 111, and was incorporated in sec. 39.23(m)-5, Regs. 118 (the Regs. applicable to the year in question). The relevant portions of T.D. 6031 provided that the indicated minerals mean the following: Calcium carbonates - Miscellaneous limestones and other calcium carbonate rocks (not specifically provided for at a 5 percent or 15 percent rate of percentage allowance) such as cement rock and limestone used or sold for use in soil treatment. This classification does not include rock or minerals used or sold for use as ballast, road making, concrete aggregates, or other purposes for which chemical composition is not a major requirement. * * *
Limestone, chemical grade - Limestone used or sold for use in the chemical trades. Limestone, metallurgical grade - Limestone used or sold for use in the production of metals. The end use test was rejected by us in the leading case of Virginian Limestone Corporation, 26 T.C. 553 (1956), in which we said at 560: We find nothing in the applicable statute, or in its legislative history, which tends to show any intention of Congress that, where a mineral has therein been specifically provided for at a stated rate, such rate may be varied by the Commissioner in accordance with the end use to which the produce is put by the taxpayer's customers. * * * Since then the test has repeatedly been rejected by the courts and has never been sustained. H. Frazier Company v. United States, 302 F. 2d 521↩ (Ct. Cl., 1962).
8. For simplicity we will usually refer hereinafter only to "chemical grade limestone," as petitioners' arguments are directed primarily to the qualities of the partnership's limestone in relation to that term alone. Respondent's expert witness testified that "chemical grade limestone" and "metallurgical grade limestone" are essentially the same; and sec. 39.23(m)-5(b), Regs. 118, as amended by T.D. 6510, 1960-2 C.B. 458↩ (see infra, at footnote 14), gives one definition for both.
9. See footnote 7, supra.↩
10. See footnote 7, supra.↩
11. It is important to distinguish "calcium carbonate" from "combined carbonate." In the context of this issue, "combined carbonate" means the total of the calcium carbonate and magnesium carbonate contents.↩
12. In one case it was found that the average combined carbonate content of limestone in the United States is in the range of 90 to 92 percent. Rock Hill Quarries Co. v. United States, 217 F. Supp. 324↩ (E.D. Mo. March 19, 1963). This figure is higher than that for the partnership's limestone. It is possible that the limestone involved in this case had a high calcium carbonate content relative to other limestone, but no showing was made as to this, and we therefore have no basis for a finding to that effect.
13. See footnote 7, supra. ↩
14. The inversive relationship between carbonate content and potential impurity content should be noted. ↩
15. T.D. 6510, 1960-2 C.B. 458, 459. These 1960 changes in definitional regulations are of course intended to apply retroactively. The problem of defining "chemical grade limestone" was eliminated for years following the one here under consideration by the passage of sec. 613(b)(6), I.R.C. 1954↩, providing a 15 percent depletion rate for "limestone."
16. The Supreme Court said in Fawcus Machine Co. v. United States, 282 U.S. 375, 378 (1931): [Regulations] constitute contemporaneous construction by those charged with the administration of the act, are for that reason entitled to respectful consideration, and will not be overruled except for weighty reasons. * * * [Italics supplied.]↩